**Slip Op. 00-137**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| NIPPON STEEL CORPORATION, | : |
| Plaintiff, | : |
| v. | : |
| THE UNITED STATES, | : |
| Defendant, | : |
| and | : |
| BETHLEHEM STEEL CORPORATION, U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ISPAT INLAND INC., LTV STEEL COMPANY, INC.; GALLATIN STEEL, IPSCO STEEL, INC., STEEL DYNAMICS, INC., and WEIRTON STEEL CORPORATION, | : |
| Defendant-Intervenors. | : |
|  | : Consolidated Court |
|  | : No. 99-08-00466 |
| BETHLEHEM STEEL CORPORATION, U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ISPAT INLAND INC., and LTV STEEL COMPANY, INC. | : |
| Plaintiffs, | : |
| v. | : |
| THE UNITED STATES, | : |
| Defendant, | : |
| and | : |
| NIPPON STEEL CORPORATION, | : |
| Defendant-Intervenor. | : |

[ITA Antidumping Duty Determination Remanded.]

Dated: October 26, 2000

Gibson, Dunn & Crutcher LLP (Daniel J. Plaine, Gracia M. Berg, Merritt R. Blakeslee, Seth M. M. Stodder, J. Christopher Wood, Albert Kim and Gregory S. Menegaz) for plaintiff Nippon Steel Corporation.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Ellen J. Schneider, Hans F. Bader and Scott B. Nardi) for plaintiffs Bethlehem Steel Corporation, U.S. Steel Group, a unit of USX Corporation, Ispat Inland Inc. and LTV Steel Company, Inc.

David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Kyle E. Chadwick), John D. McInerney, Elizabeth C. Seastrum, and Linda S. Chang, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Schagrin Associates (Roger B. Schagrin) for defendant-intervenors Gallatin Steel, IPSCO Steel, Inc., Steel Dynamics, Inc. and Weirton Steel Corp.

## OPINION

**RESTANI, Judge:**  This matter is before the court on motions for judgment on the administrative record filed by both Nippon Steel Corporation ("NSC"), Japanese respondent in an antidumping duty investigation, and Bethlehem Steel Corporation, U.S. Steel Group, Ispat Inland, Inc., and LTV Steel Company, Inc. ("U.S. Companies" or "Petitioners"), domestic petitioners before the United States Department of Commerce ("Commerce" or "the Department").  At issue is Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329 (Dep't Comm. 1999) [hereinafter "Final Results"].

Because of Commerce's failure to make timely memoranda of its ex parte meetings with Petitioners and other alleged

procedural flaws, NSC seeks vacation of the outstanding antidumping order and reinvestigation ab initio. Alternatively, NSC seeks the following: discovery as to the ex parte meetings; declaration that preliminary critical circumstances determinations may not be based on mere allegations; and remand for explanation by Commerce as to its deviations from past procedural practices, for use of electricity costs based on sales from affiliated cooperatives, and for use of NSC's weight conversion factor data. The U.S. companies seek remand for Commerce to use the dollar denominated price for NSC's U.S. sales.

### STATEMENT OF FACTS

On September 30, 1998, a group of domestic steel producers filed a petition with the Department pursuant to section 732(b) of the Tariff Act of 1930 (the "Act"), 19 U.S.C. § 1671a(b) (1994), alleging that hot-rolled, flat-rolled, carbon-quality steel ("hot-rolled steel") from Japan and other countries was being dumped in the United States, injuring a domestic industry. See P.R. Doc. 2, DOC App. Tab 1.[1] In addition to alleging injurious dumping, the petition provided evidence - including official United States import

---

[1] "P.R. Doc" and "C.R. Doc." refer to documents on the public and confidential records, respectively. "DOC App., Tab __, at __" refers to tabs and pages, respectively, of Commerce's appendix. Materials in NSC's appendix are cited as "NSC App., Tab ___, at ___."

and tariff data, an expert affidavit, and results of foreign market research - intended to support the proposition that Japanese producers made sales in Japan at prices below their fully allocated costs of production. See id. at 22-24; C.R. Doc. 1, DOC App. Tab 2; C.R. Doc. 3, DOC App. Tab 3. The petition further alleged that critical circumstances existed as to imports from Japan within the meaning of the Act. See P.R. Doc 2, DOC App. Tab 1, Fi. 14. In support of their critical circumstances allegation, the petitioners cited estimated dumping margins exceeding Commerce's normal threshold of 25 percent (to demonstrate importers' knowledge of dumping), trade data and press reports indicating massive imports over a short period of time, and evidence of harm to the domestic industry. See id. at 3-12 and Exhs. 1-3.

On October 22, 1998, in response to the information presented in the petition, Commerce published its notice of initiation of the antidumping investigation underlying this litigation. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, Japan, and the Russian Federation, 63 Fed. Reg. 56607 (Dep't Commerce 1998) [hereinafter "Initiation of Antidumping Invest."]. At the same time, Commerce initiated below cost and critical circumstances investigations with respect to Japanese hot-rolled steel. Id.

at 56,612-13.  In accordance with a newly adopted policy,[2]
Commerce stated that it would make a critical circumstances
determination "as soon as practicable," as opposed to waiting
for the preliminary determination to be issued.  Id. at
56,613.

Commerce initially issued section A of its antidumping
questionnaire to the six Japanese steel producers identified
in the petition.[3]  Because Commerce determined, however, that
it feasibly could not examine all six, on October 30, 1998, it
selected NSC and two other producers as respondents, based
upon production volume, and advised the remaining companies
that they need not respond.  See Hot-Rolled Flat-Rolled
Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 8291,
8292 (Dep't Comm. 1999) [hereinafter "Preliminary Results"].
On the same day, Commerce issued sections B through E of its
antidumping questionnaire to the three respondents.  Id.

On November 16, 1998, the United States International
Trade Commission ("ITC") notified the Department of its
affirmative preliminary finding of threat of material injury
in this case.  Certain Hot-Rolled Steel Products From Brazil,

---

[2]  See Change in Policy Regarding Timing of Issuance of
Critical Circumstances Determinations, 63 Fed. Reg. 55,364
(Dep't Commerce 1998) (Policy Bulletin 98/4) [hereinafter
"Critical Circumstances Timing"].

[3]  The six producers were NSC, NKK Corporation, Kawasaki
Steel Corporation, Kobe Steel, Ltd., Sumitomo Metal
Industries, Ltd., and Nisshin Steel Co., Ltd.

Japan and Russia, 63 Fed. Reg. 65,221 (ITC 1998) (prelim. injury determ.).

On November 30, 1998, Commerce issued a preliminary determination that critical circumstances existed. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan and the Russian Federation, 63 Fed. Reg. 65,750 (Dep't Comm. 1998) (prelim. determ. of crit. circumstances) [hereinafter "Prelim. Determ. of Critical Circumstances"]. Commerce determined preliminarily that it should impute to the Japanese importers the critical circumstances factor of knowledge of dumping, see 19 U.S.C. § 1673b(e)(1)(A)(ii), because the petition supported margins greater than the Department's customary 25 percent threshold. Prelim. Determ of Critical Circumstances, 63 Fed. Reg. at 65,750. Further, Commerce found that the combination of the ITC's November 16 preliminary finding and press reports of rising imports, falling domestic prices, and market share gains by foreign suppliers provided a reasonable basis to believe or suspect preliminarily that the importers knew or should have known of "likely injury" from dumping. Id.

With respect to the critical circumstances factor of "massive" imports, 19 U.S.C. § 1673b(e)(1)(B), Commerce found, first, that press reports sufficiently established that by the end of April 1998, importers, exporters, or producers knew or should have known that an antidumping proceeding concerning

hot-rolled products from Japan was likely.  <u>Prelim. Determ. of
Critical Circumstances</u>, 63 Fed. Reg. at 65,751.[4]  Accordingly,
pursuant to 19 C.F.R. § 351.206(i) (2000), Commerce compared
import volumes from May through September 1998 to import
volumes in the period December 1997 through April 1998 (the
immediately preceding five months).  <u>See</u> <u>Prelim. Determ. of
Critical Circumstances</u>, 63 Fed. Reg. at 65,751.  Because it
found that imports of hot-rolled steel from Japan increased by
more than 100 percent between the two periods, Commerce found
preliminarily that there had been massive imports within a
relatively short period of time.  <u>Id.</u>  In light of its
findings with respect to knowledge of dumping, knowledge of
likely injury, and massive imports, Commerce preliminarily
found a reasonable basis to believe or suspect that critical
circumstances existed with respect to Japanese hot-rolled
steel imports.  <u>See</u> <u>id.</u>

From November 16, 1998 through January 25, 1999, the
Department received responses to initial and supplemental
questionnaires.  Questionnaire section B requested, among
other things, figures that the Department could use to convert
sales made at actual and theoretical weights, respectively, to
a common basis ("conversion factor data").  <u>See</u> C.R. Doc. 40,
DOC App., Tab 5, at B-22.  NSC, in a response dated December

---

[4]  Here, the Department cited the staff's critical
circumstances memorandum, P.R. Doc 115, DOC App., Tab 4, at 3-
4 (citing press reports).

22, 1998, did not provide that data, asserting instead that Commerce did not need a "uniform quantity of measure" because "[a]ll NSC quantity types are consistent within the product type."  Id.  In its January 26, 1999 response to a supplemental request, NSC stated that steel coils sold at theoretical weight (i.e., estimated weight, based upon dimensions) "are never actually weighed" and, thus, NSC had "no way of calculating" the requested conversion factor.  P.R. Doc 196, DOC App., Tab 6, at B-24.  As discussed below, NSC now admits that its initial and supplemental responses were incorrect.

NSC timely reported its gross unit prices for U.S. sales in dollars.  See C.R. Doc. 40, DOC App., Tab 5, at C-19.  It also reported net prices in yen for each sale, which NSC and its customers derived by discounting the invoiced dollar amount by the standard discount rate, then converting to yen at the exchange rate applicable on the ninth day after shipment.  See id. at C-22.  NSC's invoices reflect both the gross dollar price and the net yen price.  Id.  Commerce verified that NSC received payments in yen, and that NSC internally recorded the accounts receivable in yen.  See C.R. Doc. 127, NSC App., Tab 21, at 2-5.

On February 19, 1999, Commerce published its preliminary dumping determination.  Preliminary Results, 64 Fed. Reg. at 8291.  Among other findings, the Department preliminarily

assigned an adverse (highest calculated) margin to sales made by NSC upon a theoretical weight basis because "NSC did not provide conversion factors for these U.S. sales upon the Department's request . . . ." Id. at 8298.

Four days later, on February 23, 1999, NSC submitted a theoretical-to-actual weight conversion factor with no explanation for its lateness. See C.R. Doc. 108, NSC App., Tab 24, at 6. On March 2, 1999, NSC submitted preverification changes and raw backup data supporting a corrected conversion factor. See C.R. Doc. 118, NSC App., Tab 35, at 2-3. NSC stated that its prior misstatement that actual weights were unavailable was "based on a factual misunderstanding" by NSC personnel. Id. at 3.

Commerce conducted cost and sales verifications of NSC on March 1 through 5 and March 8 through 12, 1999, respectively. See C.R. Doc. 125, NSC App., Tab 22 (cost); C.R. Doc. 127, NSC App., Tab 21 (sales). Because NSC had not timely provided weight conversion data, Commerce informed NSC at verification that it would not accept or verify the conversion factor or supporting data. See Final Results, 64 Fed. Reg. at 24,361. Verification reports were issued on March 26. See C.R. Doc. 125, NSC App., Tab 22 (cost report); C.R. Doc. 127, NSC App., Tab 21 (sales report).

On April 12, 1999, Commerce excluded from the case record, NSC's late submissions containing the weight

conversion factor and the supporting data.  P.R. Doc 319, NSC
App., Tab 26, at 3.  After briefing, a public hearing was held
on April 21, 1999.  P.R. Doc 343.  Thereafter, Commerce placed
on the record memoranda memorializing that nine ex parte
meetings related to the investigation had taken place.  C.R.
Docs. 344-352, NSC App., Tab 27.

In its May 6, 1999 final determination, Commerce made
five determinations pertinent to this case.  First, Commerce
used the yen value listed on NSC's invoices as the starting
point for determining NSC's U.S. prices, upon the grounds that
the yen figure was the amount "paid by NSC's customers."
Final Determination, 64 Fed. Reg. at 24,345.  As in the
preliminary determination, Commerce converted this value to
dollars at the exchange rate effective on the shipment date.
See id.

Second, in response to NSC's complaints of undocumented
and/or improperly documented ex parte communications, Commerce
stated that it had "provided NSC with all information relied
upon in the investigation."  Id. at 24,347.  The Department
found, in addition, that NSC was not prejudiced by any delay
in placing ex parte memoranda on the record because (a) the
Department had not obtained "new information" in the
memorialized conversations, and (b) "all information was
discussed on the record."  Id.

Third, pursuant to 19 U.S.C. § 1677b(f)(2), Commerce disregarded, for purposes of calculating sales margin, amounts that NSC paid to affiliated electric power cooperatives for its power supplies. See id. at 24,349. Instead, Commerce imputed the generally higher electricity prices of NSC's unaffiliated suppliers, finding that unaffiliated utilities supplied the "identical input" in "the market under consideration." Id.

Fourth, Commerce confirmed its rejection of NSC's conversion factor data and assigned a margin to the affected sales based upon facts available. See id. at 24,360-61. Finding that NSC had failed to act to the best of its ability with respect to the factor because it could have provided the factor when originally requested, Commerce drew an adverse inference in assigning that margin. See id. at 24,361-62. Finally, Commerce made a negative critical circumstances determination for NSC based, at least in part, upon the margin assigned to the company. See id. at 24,337; C.R. Doc. 167, NSC App., Tab 30, at 2.

On June 23, 1999, the ITC published its final determination that dumping of Japanese hot-rolled steel caused material injury to a domestic industry. Certain Hot-Rolled Steel Products From Japan, 64 Fed. Reg. 33,514 (ITC 1999) (final injury determ.). The ITC found, however, that critical circumstances did not exist. See id. On June 29, 1999,

Commerce published its antidumping duty order and announced in accordance with the ITC's negative critical circumstances decision that it would direct the release of shipments entered prior to its preliminary dumping determination, without the assessment of antidumping duties.  <u>Certain Hot-Rolled, Flat-Rolled Carbon-Quality Steel Products From Japan</u>, 64 Fed. Reg. 34,778, 34,780 (Dep't Comm. 1999) (antidumping duty order). Bethlehem and NSC timely filed actions contesting Commerce's final determination pursuant to 19 U.S.C. § 1516a(a)(2).

<u>JURISDICTION AND STANDARD OF REVIEW</u>

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). In reviewing antidumping duty determinations, courts "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'"  <u>Fujitsu Gen'l Ltd. v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

<u>DISCUSSION</u>

I.  <u>Ex Parte Meetings</u>

There is no dispute that petitioner engaged in <u>ex parte</u> meetings with Commerce officials, including the Secretary. There also appears to be no serious dispute that memoranda were not placed on the record memorializing all of those meetings.  It also appears that the memoranda that were filed

were drafted months after the meetings by persons not in

attendance.  They clearly are truncated and were placed on the

record on or about the day of the final determination.[5]

Commerce argues that the meetings were not covered by the

ex parte meetings provisions of the antidumping laws because

they did not involve the dissemination of factual information

to Commerce.  The Department further insists that any flaws in

its procedures were harmless error because any factual

information received was already in the record or was not

relied upon by the decision-makers.

> Under 19 U.S.C. § 1677f(a)(3), the Department must
>
> maintain a record of any ex parte meeting between –
> (A) interested parties or other persons providing
>       factual information in connection with a
>       proceeding, and
> (B) the person charged with making the
>       determination, or any person charged with making
>       a final recommendation to that person, in
>       connection with that proceeding,
> if information relating to that proceeding was
> presented or discussed at such meeting.

19 U.S.C. § 1677f(a)(3).  See Melamine Chems., Inc. v. United

States, 8 CIT 105, 108 & n.6, 592 F. Supp. 1338, 1341-42 & n.6

(1984)(setting forth rule); Gilmore Steel Corp. v. United

States, 7 CIT 219, 229, 585 F. Supp. 670, 679 (1984) ("Ex

parte communications per se are thus not improper . . . , but

a record of them must be maintained and made available.")

---

[5] The documents are all dated April 28, 1999, but the
parties do not dispute that they were placed in the record
only at the time of the determination.

(citation omitted).  Cf. GSA, S.R.L. v. United States, 77 F.

Supp. 2d 1349, 1358 (Ct. Int'l Trade 1999) (ex parte

communication of purely legal arguments need not be

memorialized or disclosed).

The memoranda memorializing each such ex parte

communication must include "the identity of the persons

present at the meeting, the date, time, and place of the

meeting, and a summary of the matters discussed or submitted."

19 U.S.C. § 1677f(a)(3) (emphasis added).  The memoranda must

be included in the official "record of the proceeding," id.,

and must be available for inspection and copying.  19 C.F.R.

§ 351.104(b).  Any memoranda detailing ex parte communications

must be a part of the record for judicial review.  19 U.S.C.

§ 1516a(b)(2)(A).  See also Sachs Auto. Prods. Co. v. United

States, 17 CIT 290, 291-92 (1993) (setting forth requirement).

From press reports and Commerce's summaries of some

meetings, it is clear that factual information was conveyed.[6]

Petitioners were clearly seeking relief and, at the very

least, made numerous factual statements about the condition of

---

[6]  See C.R. Docs. 344-352, NSC App., Tab 27, and Exhibits
1 through 11 to NSC's moving brief.  Because the record is not
complete in this regard, the court takes notice of the press
reports submitted by NSC.  See Citizens to Preserve Overton
Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971) (full
administrative record necessary for judicial review),
overruled on other grounds, Califano v. Sanders, 450 U.S. 99,
105 (1977); F.lli De Cecco di Filippo Fara San Martino S.p.A.
v. United States, 21 CIT 1124, 980 F. Supp. 485 (1997)
(parties permitted to submit information to complete record).

the U.S. industry.  This factual information is highly relevant to critical circumstances findings.  <u>See</u> 19 U.S.C. §§ 1673b(e) & 1673d(a)(3).  Commerce does not dispute this in any serious way.  Rather, it argues nothing was added to the record that was not included in some other manner.

Whether or not information is in the record via the petition or otherwise, Commerce is not entitled to choose which covered <u>ex parte</u> meetings it will memorialize, based on its own identification of redundancies.  Parties are entitled to know when and how information was conveyed; they should not have to rely on subtle judgments by Commerce officials or employees about whether factual information is important, is already in the record in some other form, or is even useful to the agency or to the parties.    All Commerce was required to do was to have timely memoranda drafted and filed so that parties could review them at some useful point during the proceeding.  Placing a few very summary memoranda on the record after all decision-making is complete is useless and disrespectful of the administrative process, as well as violative of the statute.  By requiring that the memoranda be available for "inspection," the statute requires that the parties to the proceeding be able to inspect the memoranda so that they may comment on the factual data contained therein or ask for more detailed memoranda, if those placed on the record are not informative.  <u>See</u> <u>Weiland-Werke AG v. United States</u>, 4

F. Supp. 2nd 1207, 1212-13 (Ct. Int'l Trade 1998) (parties must be allowed to comment on information obtained by Commerce). See also 19 U.S.C. § 1677m(g) (requiring "opportunity to comment on the information obtained by the administrative authority"). Commerce's disregard as to timing does not serve procedural due process or the goal of transparency, as required by the statute.

The court, however, will not vacate the final determination and subsequent order based on Commerce's error, as requested by NSC. It is likely that in this case the error that is obvious was harmless,[7] and NSC did not establish that any new factual information was submitted on matters related to margin calculation, such as date of sale. NSC did not seek discovery in a timely manner to prove its case. NSC waited to ask for discovery as an alternative remedy in its dispositive motion. NSC should have asked for discovery in order to support its dispositive motion, and to complete the record for the motion if it believed the record was incomplete without the memoranda. See Nat. Res. Def. Council, Inc. v. Train, 519 F.2d 287, 291-2 (D.C. Cir. 1975) (overturning district court's review of agency action based on incomplete administrative record); Saha Thai Steel Pipe Co., Ltd. v. United States, 11

---

[7] The final critical circumstances decision was in NSC's favor. See Antidumping Duty Investigations of Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan; Final Determination of Critical Circumstances (April 28, 1999), C.R. Doc. 167, NSC App., Tab 30, at 2.

CIT 257, 259, 261, 661 F. Supp. 1198, 1202-03 (discovery outside administrative record may be had upon a showing that record is incomplete), amend. denied, 11 CIT 392, 661 F. Supp. 1203 (1987).

Commerce, however, does not admit its clear violation of the statute. The Department was provided an opportunity by the court to avoid an injunction by issuing a policy statement that effectively affirmed the agency's commitment to act in accordance with the terms of the statute. In particular, the Department under such a policy guideline would place on the record memoranda of ex parte meetings where factual information pertinent to the proceedings is received, so that parties may access such information during an investigation. Notwithstanding this opportunity to avoid an injunction by stating simply and publicly that it would follow the express provisions of its governing statute, as required by law, Commerce has not done so. Nor has it provided any indication to the court that it will do so in the future.

Accordingly, the court determines that (1) it is likely that Commerce will continue to violate 19 U.S.C. § 1677f(a)(3) either in this ongoing proceeding or other proceedings; (2) the error is not easily repaired; late memoranda may not be accurate and it is costly, not only in monetary terms, but in terms of administrative and judicial time and effort to make repair efforts; (3) public policy requires correction of

this practice; and (4) no harm will befall defendant by complying.  Therefore, the Assistant Secretary for Import Administration shall issue instructions that ex parte memoranda required by 19 U.S.C. § 1677f(a)(3) will be drafted expeditiously in all cases, reviewed by a person in attendance at the meeting, and placed in the record as soon as possible, so that parties may comment effectively on the factual matters presented.  The memoranda are required whether or not the factual information received was received previously, is expected to be received later in the proceedings, or is expected to be used or relied on.

## II.  Preliminary Critical Circumstances Determination

Although the Final Critical Circumstances Determination was negative, NSC asked that the standards for preliminary determinations be declared because this is an issue that is capable of repetition and is likely to evade review.  See Southern Pac. Term. Co. v. ICC, 219 U.S. 498, 515 (1911); Associacao dos Industriais de Cordoaria e Redes v. United States, 17 CIT 754, 759, 828 F. Supp. 978, 984 (1993) ("Relief may exist for controversies that appear moot, but are 'capable of repetition, yet evade review.'") (citation omitted).  The parties appear to be in agreement that this test is met and the court has jurisdiction to review the matter.  Because affirmative preliminary determinations are supplanted by final determinations, which may be negative, as in this case, the

court agrees that the standards for preliminary critical

circumstances determinations may be reviewed.

Under 19 U.S.C. § 1673b(e), before making a preliminary

critical circumstances determination, the Department must

> determine, on the basis of the information available
> to it at the time, whether there is a reasonable
> basis to believe or suspect that –
>
> > (A)(i) there is a history of dumping and
> > material injury by reason of dumped imports in
> > the United States or elsewhere of the subject
> > merchandise, or
> >
> > (ii) the person by whom, or for whose account,
> > the merchandise was imported knew or should have
> > known that the exporter was selling the subject
> > merchandise at less than its fair value and that
> > there was likely to be material injury by reason
> > of such sales, <u>and</u>
> >
> > (B) there have been massive imports of the
> > subject merchandise over a relatively short
> > period.

19 U.S.C. § 1673b(e)(1) (emphasis added).

On November 23, 1998, Commerce made a preliminary

critical circumstances determination, finding that there was a

"reasonable basis to believe or suspect that importers knew or

should have known that material injury from dumped merchandise

was likely." <u>Prelim. Determ. of Critical Circumstances</u>, 63

Fed. Reg. at 65,750.[8]  Prior to this investigation, Commerce

made its critical circumstances determination based on all

information gained up to the time of the preliminary

---

[8]  A finding of critical circumstances allows the imposition of duties from the time of initiation of the investigation.  <u>See</u> 19 U.S.C. § 1673b(e)(2).

determination.  After the proceeding at issue was commenced

Commerce issued a policy statement permitting earlier critical

circumstances determinations.  See Critical Circumstances

Timing, 63 Fed. Reg. at 55,364.  See also 19 C.F.R.

§ 351.206(c).  NSC argues that this new policy allowed

Commerce to make its preliminary critical circumstances

determination without investigating petitioners' allegations

and that the only support for the determination was the bare

allegations of the petition.  There is nothing in the statute

which prohibits the early issuance of the determinations.  In

fact, because the petition alleged critical circumstances,

Commerce was permitted to make the determination after

commencement of the investigation based on any information

available to it.  See 19 U.S.C. § 1673b(e)(1).

Further, while Commerce admits it relied largely on

petition information, that information was more than bare

allegations.  It contained public import information, trade

reports and surveys, news reports, and an affidavit.

Apparently, Commerce also obtained some additional information

and, without conducting a formal verification, attempted to

confirm the essential allegations of the petition.  See

Initiation of Antidumping Invest., 63 Fed. Reg. at 56,613.

Here, in its preliminary critical circumstances

determination, Commerce found a massive surge in import

volumes in which "imports of hot-rolled steel from Japan

increased by more than 100 percent . . . . " <u>Prelim. Determ.
of Critical Circumstances</u>, 63 Fed. Reg. at 65,751. This was
more than six times greater than the 15 percent increase
needed to establish massive imports under Commerce's
established practice. <u>Id.</u> at 65,750. <u>See also</u> 19 C.F.R.
§ 351.206(h)(2) (15 percent threshold). Commerce also found
that importers knew or should have known both that the
respondents were selling the subject merchandise at less than
fair value, and that there was likely to be material injury.
It based this determination on the fact that dumping margins
documented in the petition were in excess of 25%, <u>see</u> <u>Certain
Cut-To-Length Carbon Steel Plate from the People's Republic of
China</u>, 62 Fed. Reg. 61,964, 61,967 (Dep't Comm. 1997)(final
determ.) (knowledge of dumping imputed to importers where
dumping rate greater than 25%), and that there was other
evidence, including "numerous press reports, . . . falling
domestic prices resulting from rising imports, and domestic
buyers shifting to foreign suppliers." <u>Prelim. Determ. of
Critical Circumstances</u>, 63 Fed. Reg. at 65,750. Commerce also
considered comments submitted by respondents, including NSC.
<u>See</u> <u>Opposition of Japanese Respondents to Petitioners' Request
for an Early Critical Circumstances Determination</u> (Oct. 26,
1998), P.R. Doc. 56 (NSC and four other respondents challenged
petitioners' evidence regarding, e.g., injury and importer
knowledge); Commerce's <u>Preliminary Critical Circumstances</u>

Memorandum (Nov. 23, 1998), P.R. Doc. 115, DOC App., Tab 4, at

3 (discussing respondents' contentions).  Thus, Commerce had a

"reasonable basis to believe or suspect" that critical

circumstances existed.[9]  19 U.S.C. § 1673b(e)(1).

Accordingly, the court concludes that Commerce's procedures as

to the preliminary critical circumstances determination were

not flawed.


III.      Expedited Procedures and "Burdensome" Data Requests

     As part of its claim that the entire investigation was

defective and unfair, NSC cites various procedural flaws of

which it complained during the proceeding, but did not allege

clearly in its case brief before the agency.  In view of the

preservation of its overall unfairness argument and the fact

that NSC raised the complaints in various forms during the

investigation, the court considers these sub-issues adequately

exhausted.

---

     [9]  The ITC's preliminary negative present material injury
finding is irrelevant.  Assuming arguendo that the ITC's
finding was inconsistent with Commerce's, both findings may be
found supported by substantial evidence.  See Pohang Iron and
Steel Co., Ltd. v. United States, No. 98-04-00906, 1999 WL
970743, at *8 (Ct. Int'l Trade Oct. 20, 1999) (quoting Consolo
v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)).
Commerce, however, apparently considers the affirmative threat
of injury finding supportive of its decision.  The court is
not going to split this hair.  Threat of imminent injury,
while not strong evidence, would appear to contribute to a
finding of critical circumstances.

First, NSC complains that the usual time for complex investigations was not allowed.  In view of the critical circumstances evidence before Commerce, the court cannot find that Commerce abused its discretion by not extending the time for investigation.  Second, Commerce is permitted to require Period of Investigation ("POI") reporting as opposed to Fiscal Year reporting in order to meet its own investigatory obligations.  Commerce gave NSC additional time to adjust its data to the POI.  This also does not appear an abuse of discretion.  Finally, according to NSC, Commerce improperly requested financial data on NSC's affiliates for purposes of investigating whether sales were made below cost.  NSC alleged minimal affiliate involvement.  Commerce requested data to verify this.  By the time of the Final Determination, Commerce was satisfied with NSC's response.  The fact that NSC proved that affiliate involvement was minimal does not establish that Commerce's method of investigation was abusive, even if a large amount of data requested was determined ultimately to be unnecessary to the final determination.

Further, whether NSC is right or wrong about the procedures themselves, it has not shown prejudice resulting therefrom.  As evidence of an overall procedurally defective or unfair investigation, these complaints considered collectively fall short.  The court has considered the entire record, including all of NSC's complaints, the handling of

objections from all parties, and Commerce's lax procedures on
ex parte memoranda.  The court does not perceive an overall
unfair or defective proceeding which would warrant vacation of
the final determination and order and recommencement of the
investigation.

IV.  Use of Adverse Facts Available for NSC's Weight
     Conversion Factor

     NSC alleges that although it was late in submitting the
weight conversion factor, its error was a simple inadvertence.
It alleges that the persons responsible for answering the
Commerce questionnaire were mistaken in their belief that the
weight conversion data did not exist.  Commerce alleges that
this was not a simple error, but that it was an affirmative
misstatement, and that NSC did not act as a reasonable and
responsible respondent should in failing to ask plant
personnel for the available data.  Accordingly, Commerce
concluded that NSC did not act to the best of its ability and,
that not only may Commerce reject the late data, but it may
use adverse substitute data in accordance with 19 U.S.C.
§ 1677e(b).

     There are two related issues here.  It is likely true
that because the data was late, Commerce did not have to use
it.  See 19 U.S.C. § 1677e(a)(2)(B).  Commerce may establish

time limits to aid the completion of its mission.[10]  See, e.g.,
19 C.F.R. § 351.301.  It may enforce such limits by rejecting
late, but verifiable, data.  See Seattle Marine Fishing Supply
Co. v. United States, 12 CIT 60, 71, 679 F. Supp. 1119, 1128
(1988) (refusal to accept untimely filed responses not
unreasonable or contrary to law).  If a submission is untimely
Commerce may use other facts available.  See 19 U.S.C.
§ 1677e(a)(2)(B).  More is required, however, before an
adverse inference may be drawn as to what facts are to be
used.  See 19 U.S.C. § 1677e(b).

Commerce may not resort to adverse facts available unless
it makes the additional finding that a respondent "failed to
cooperate by not acting to the best of its ability."  19
U.S.C. § 1677e(b); 19 C.F.R. § 351.308(a).  See also Borden,
Inc. v. United States, 4 F. Supp. 2d 1221, 1247 (Ct. Int'l
Trade 1998) (remanding because Commerce "did not make the
required additional finding that [respondent] had failed to
act to the best of its ability"), aff'd sub nom. F.lli De
Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216
F.3d 1027 (Fed. Cir. 2000); Mannesmannrohren-Werke AG v.

---

[10]  Commerce argues that 19 U.S.C. § 1677m(d), which
provides an opportunity to cure deficiencies, does not save
the submission because NSC's submission was untimely, not
merely deficient.  Obviously, NSC made an overall timely
submission.  Commerce must draw some reasonable lines in
determining when data constitutes an untimely separate
submission of information or is a curable deficiency in the
original data.  The court need not resolve that issue here.

<u>United States</u>, 77 F. Supp. 2d 1302, 1325 (Ct. Int'l Trade 1999) [hereinafter "<u>Mannesmann</u>"](remanding "so that [Commerce] may reconsider its conclusion . . . that [respondent] failed to act to the best of its ability in providing [incomplete] information about input purchases"); <u>Ferro Union</u>, 44 F. Supp. 2d 1310, 1331 (Ct. Int'l Trade 1999) (remanding with instructions to determine whether respondent "deliberately chose not to disclose [requested information]").

Commerce must reach its finding through a reasoned inquiry into the facts. "[I]t is not sufficient for Commerce to simply assert this legal standard [not acting to the best of ability] as its conclusion or repeat its finding concerning the need for facts available." <u>Mannesmann</u>, 77 F. Supp. 2d at 1313. <u>Accord</u> <u>Ferro Union</u>, 44 F. Supp. 2d at 1330 ("[M]ere recitation of the relevant standard is not enough for Commerce to satisfy its obligation under the statute.") (citations omitted). Nor may Commerce rest its finding on mere suspicions or "vague hints." <u>Mannesmann</u>, 77 F.Supp. 2d at 1317 (quoting <u>Borden</u>, 4 F. Supp. 2d at 1246-47).

In order for its finding to be supported by substantial evidence, "Commerce needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation." <u>Mannesmann</u>, 77 F. Supp. 2d at 1313-14 (citation omitted). <u>Accord</u> <u>Ferro Union</u>, 44 F. Supp.

2d at 1331 (remanding because "Commerce ha[d] not pointed to substantial evidence" to show that respondent's failure to provide requested information "was a failure by [respondent] to comply to the best of its ability").  Judged by this legal standard, Commerce's finding that NSC did not act to the best of its ability cannot stand.

Because the late information submitted by NSC was available before verification, and the accuracy of the data could be checked, Commerce might have accepted the data on the theory that the lapse was inadvertent.  Because Commerce decided to draw the adverse inference, however, it did not verify the data or examine the circumstances surrounding the error.[11]  This is permissible only if Commerce first properly drew the adverse inference.

The only question relevant to the issue of non-cooperation is whether Commerce found NSC's failure to provide the requested theoretical weight conversion data to "constitute[] anything more than an inadvertent error." Mannesmann 77 F. Supp. 2d at 1316.  As stated in NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995),

---

[11] Evidence received at verification is part of the record for review.  See Rubberflex Sdn. Bhd. v. United States, 59 F. Supp. 2d 1338, 1345 (Ct. Int'l Trade 1999).  Commerce's verification procedures must allow meaningful participation by respondent.  Id. at 1346.

"[w]hile the parties must exercise care in their submissions, it is unreasonable to require perfection."[12]

There is confusion as to the standard for a respondent's best ability to comply, which controls whether an adverse inference may be drawn pursuant to 19 U.S.C. § 1677e(b). Sometimes only willfulness can explain an error in compliance, if the objective capability of providing the data exists.  A finding of willfulness, however, in the sense of a deliberate decision not to comply, is not always a prerequisite to the drawing of an adverse inference.  Cf. Krupp Thyssen Nirosta GmbH v. United States, No. 99-08-00550, 2000 WL 1118114, at *2-*3 (Ct. Int'l Trade July 31, 2000) (upholding Commerce's application of adverse facts available where respondent failed to inform Commerce of its inability to comply with request for information).  On the other hand, as indicated, simple inadvertence is insufficient for application of an adverse inference.  See Mannesmann, 77 F. Supp. 2d at 1316.

First, the adverse inference being drawn is that the respondent would have provided the data if it were beneficial. Cf. Statement of Administrative Action Accompanying the URAA ("SAA"), H.R. Doc. No. 103-316 at 870 (1994), reprinted in

---

[12] Commerce argues NTN dealt with a clerical error, not an error in judgment.  There is no evidence, however, that NSC made any judgment about whether to provide the data.  The limits of clerical error are not well-defined.  See World Finer Foods, Inc. v. United States, No. 99-03-00138, 2000 WL 897752, at *7-*8 (Ct. Int'l Trade June 26, 2000).

1994 U.S.C.C.A.N. 4040, 4199 ("Commerce . . . may employ adverse inferences to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."). It is difficult to draw such an inference from a simple mistake. Second, in various ways the statute, regulations and Commerce's practices permit correction of simple errors. See, e.g., 19 U.S.C. § 1673d(e); 19 U.S.C. § 1677m(d); 19 U.S.C. § 1677m(e); 19 C.F.R. § 351.224; 19 C.F.R. 351.301(c)(2); and 19 C.F.R. § 351.308(e). At a minimum, Commerce must find that a respondent could comply, or would have had the capability of complying if it knowingly did not place itself in a condition where it could not comply. See Gourmet Equip. (Taiwan) Corp. v. United States, No. 99-05-00262, 2000 WL 977369 at *5 (Ct. Int'l Trade July 6, 2000). Commerce must also find either a willful decision not to comply or behavior below the standard for a reasonable respondent. Insufficient attention to statutory duties under the unfair trade laws is sufficient to warrant adverse treatment. It implies an unwillingness to comply or reckless disregard of compliance standards. Commerce must be in a position to compel meaningful attention to and compliance with its requests. See Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1560 (Fed. Cir. 1984).

The problem here is that, thus far, Commerce has found nothing more than a simple mistake. It must go further. It

must analyze NSC's error in the light of its overall conduct, the importance of the information, the particular time pressures of this investigation, and any other information that will bear on the determination of whether this was an excusable inadvertence on NSC's part or a demonstration of lack of due regard for its responsibilities in the investigation.

As the court has said before, the 1994 amendments to the facts available provision require some difficult decision-making. Ferro Union 44 F. Supp. 2d at 1329. Without some clear findings, mere inadvertence that does not impede the investigation can bring about penalties far more onerous than warranted by the conduct. The appearance, if not the actuality, of arbitrary and capricious decision-making in this area is a serious problem. As stated in De Cecco, 216 F.3d at 1032, "Commerce's discretion in these matters . . . is not unbounded."

V.    Electricity Costs

In this case Commerce performed a below cost investigation to determine whether sales over time generally recoup cost of production. See 19 U.S.C. § 1677b(b). Where sale-to-sale price comparisons are not possible, cost is also used to construct normal value. See 19 U.S.C. § 1677b(e). In order to obtain reliable costs, Commerce may disregard prices

of inputs obtained from affiliates if such prices do not fairly reflect market prices.  See 19 U.S.C. § 1677b(f)(2).

During the POI, NSC bought electricity from unaffiliated regional utilities.  It also bought electricity from affiliated cooperatives, all of which sell exclusively to NSC. Commerce disregarded the cooperative price because it concluded that the statute focuses upon market price, not upon "the nature or circumstances of the supplier."  Final Results, 64 Fed. Reg. at 24,349.

There is no difference here in the input purchased or circumstances of the sale which explains the difference in price between the two types of suppliers.  Cf. Cinsa, S.A. de C.V. v. United States, 966 F. Supp. 1230, 1237 & n.5 (Ct. Int'l Trade 1997) (transportation costs and volume discounts, inter alia, explained discrepancies between prices of affiliates and non-affiliates); Stainless Steel Wire Rod From Taiwan, 63 Fed. Reg. 40,461, 40,471 (final determ.) (Dep't Comm. 1998) (physical product differences explained price discrepancy between prices of affiliates and non-affiliates). Calling the affiliates' prices "wholesale" explains nothing. In the absence of any explanation of the price discrepancy that has meaning for cost investigations, Commerce properly focused on the market price reflected in the arm's length transactions.  The court sustains Commerce on this issue.

VI.   Methodology for Determining Starting U.S. Price

Under 19 U.S.C. § 1677a(a), Commerce must base its calculation of the export price of a particular sale on "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation . . . " (the "Starting Price").  To establish export price the Department must make certain adjustments to the Starting Price in both the United States and foreign markets.  See 19 U.S.C. § 1677a(c).  If the currency of the Starting Price is not in U.S. dollars, Commerce will convert the Starting Price to U.S. dollars before making its margin comparison.  See 19 U.S.C. § 1677b-1(a).  Commerce makes currency conversions into dollars using the rate in effect on the date of sale.  See id.

In this case, Commerce used as the Starting Price the final, yen-denominated amounts on NSC's invoices as converted to dollars at the rate effective on the date of sale. Petitioners allege that this methodology distorted the calculation of NSC's margins because it (1) disregarded the invoiced dollar price that was "definite and determinable" on the date of sale, and (2) incorporated exchange rate fluctuations outside the seller's control.  In addition, Petitioners contend that Commerce's currency conversion methodology deviates from past practice.[13]

---

[13] In its initial brief, Petitioners also had alleged that Commerce failed to apply the forward currency transaction

(continued...)

Petitioners' first allegation that Commerce should have used the invoiced price in dollars as the Starting Price is without merit because this price does not reflect the agreed value of sale between NSC and its customers.   The proper Starting Price is the price expressed in the currency that preserves the agreed value of the sale from the time the price is set until it is paid.   See Voss Int'l Corp. v. United States, 628 F.2d 1328 (CCPA 1980).   The parties in Voss entered into a series of agreements that prescribed a specific price in one currency to be settled in another currency, yet adjusted for currency fluctuation before payment.   Id. at 1334-35.   The court held that in such a case and for the purposes of determining whether a sale was complete under 19 U.S.C. § 162, the "clear result is a definite and determinable price [in the converted currency] irrevocably agreed to prior to the time of exportation."   Id. at 1335.   Accordingly, the proper Starting Price is the one denominated in the currency that effectuates the intent of the agreement on price over the course of a sale, rather than the initial benchmark price.

Here, NSC and its customers had agreed that after applying standard discounts, NSC would convert the invoiced

---

[13](...continued)
exception to NSC's sales pursuant to 19 U.S.C. § 1677b-1(a).
The parties, however, have agreed that this argument may not
be raised on appeal because Petitioners failed to raise it in
the administrative proceeding.  Tr. at 68.  Thus, the court
does not reach this issue.

dollar price to yen based on the exchange rate in effect on the ninth day following shipment. The parties intended that the value of the sale be denominated in yen. That the payment was in fact made and recorded in yen is evidence of such intent. See Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan, 64 Fed. Reg. 73,215, 73,226 (Dep't Comm. 1999) (final determ.) (price in yen is appropriate Starting Price where respondent records negotiated price in yen, payment is made in yen, and yen value is tracked through accounting records). Because the dollar-based net price in yen (the "net yen price") reflects the intention of the parties as to the agreed upon value of the sale, Commerce was correct in using it as the Starting Price rather than the dollar-denominated price.

Petitioners rely on Polyvinyl Alcohol from Taiwan, 61 Fed. Reg. 14,064, 14,067-68 (Dep't Comm. 1996) (final determ.), to support their argument that use of the net yen price was distortive because it incorporated currency exchange fluctuations that were outside the control of the parties to the sales agreement. In fact, Polyvinyl Alcohol from Taiwan supports the contrary position. There, Commerce found that because the "essential terms of price and quantity are firm when they are no longer within control of parties to alter," a sale was complete even though the parties did not know what conversion rate would be applied pursuant to their agreement.

Id. at 14,067.  Because the Starting Price reflects the value of a completed sale, it should be in the currency in the final amount paid even if such amount was not known at the time the parties entered into the agreement.  Here, the NSC and its customers had agreed as of the date of sale on all of the price elements that comprised the sale price, including the mechanism for determining the final price.  Because the exchange rate that was applied to reach the ultimate price paid in yen had been agreed to by the parties prior to the date of sale, Commerce's use of the net yen price was not distortive.

Lastly, Petitioners contend that Commerce's methodology deviates from past practice as principally reflected in Ferrosilicon from Brazil, 62 Fed.Reg. 43,504 (Dep't Comm. 1997)(final determ.), and Stainless Steel Wire Rod from Japan, 63 Fed. Reg. 40,434 (Dep't Comm. 1998) (final determ.) [hereinafter "Steel Wire Rod"].  In Ferrosilicon from Brazil, Commerce observed that "[i]t is established . . . policy to use the actual U.S. price in the currency in which it was originally denominated on the date of sale and to avoid any unnecessary currency conversion."  62 Fed. Reg. at 43,511.[14]

---

[14] This language is essentially the same as another determination also cited by Petitioners as reflecting past practice, namely, Silicon Metal From Brazil, 62 Fed. Reg. 47441, 47445 (Dep't Commerce 1997) (amending Silicon Metal From Brazil, 62 Fed. Reg. 1953, 1961 (Dep't Commerce 1997) (final results)).

Petitioners maintain that in Ferrosilicon from Brazil, 62
Fed.Reg. 54,085, 54,085-86 (Dep't Comm. 1997)(amended final
determ.), Commerce amended its final results to use the U.S.
price denominated in dollars, even though the exporter
*received payment* in an equivalent amount of Brazilian
currency.  Petitioners omit that in this determination, the
price was denominated and payment initially had been made in
U.S. dollars; the exporter received payment in Brazilian
currency only because Brazilian law required U.S. buyers to
make payment to the Brazilian exporters's banks to exchange
dollar revenues for Brazilian currency upon receipt of
payment.  Commerce therefore determined that where payment was
made in U.S. dollars, it was a ministerial error to convert to
Brazilian currency, then back to U.S. dollars to arrive at the
Starting Price.  See id.  Where, as here, the parties *agree* to
a conversion to a particular currency on a specified date, and
payment is made in that currency, the effective currency is
the one in which the sale is settled.

     Petitioners also rely on Steel Wire Rod, 63 Fed. Reg. at
40,446-47, to demonstrate that Commerce's past practice is to
use as the Starting Price the price that was set in dollars
even though payment was made in a foreign currency.  Such
reliance is misplaced.  In Steel Wire Rod, Commerce departed
from its normal practice of using the converted net price as
the Starting Price because its determined that the respondent

complied with Commerce's overbroad requests for information. Commerce noted that under such circumstances, rather than rejecting the data or applying facts available, it would continue "to use the information provided by [the respondent] in the final determination." Id. at 40,447.  Here, NSC's compliance with Commerce's requests is not at issue and, as described above, Commerce applied its general practice of arriving at the Starting Price by converting the net price paid in foreign currency into U.S. dollars, rather than simply using the underlying dollar-denominated benchmark.

Accordingly, the court concludes that Commerce's Starting Price methodology is supported by substantial evidence and is in accordance with law.

<u>CONCLUSION</u>

This matter is remanded to Commerce for it to determine whether, as to weight conversion factors,  NSC acted to the best of its ability within the meaning of 19 U.S.C. § 1677e(b).  Commerce shall also issue a policy statement on <u>ex parte</u> memoranda, in accordance with this opinion.

_____
Jane A. Restani
JUDGE


Dated:  New York, New York
        This    day of October, 2000.