**Slip Op. 00-170**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

ALLEGHENY LUDLUM CORP., <u>et al.</u>,   :

                         :

          Plaintiffs,      :

                         :      Before: WALLACH, Judge

       v.              :      Consol. Court No.: 99-06-00369

                         :

UNITED STATES,         :

                         :      **PUBLIC VERSION**

         Defendant,     :

                         :

     and              :

                         :

YIEH UNITED STEEL CORP.,   :

                         :

       Defendant-Intervenor.  :

_____:

[Defendant-Intervenor's motion for judgment on the agency record DENIED. Plaintiffs' motion for judgment on the agency record DENIED. Defendant's cross-motion for remand GRANTED.]

                                          Decided: December 28, 2000

<u>Collier Shannon Scott PLLC</u>, (<u>David A. Hartquist</u>, <u>Jeffrey S. Beckington</u>, <u>Adam H. Gordon</u>), for Plaintiffs.

<u>David W. Ogden</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director; <u>Lucius B. Lau</u>, Commercial Litigation Branch, Civil Division, Department of Justice; <u>Cindy G. Buys</u>, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

<u>White & Case</u>, (<u>William J. Clinton</u>, <u>Osama Umejima</u>, <u>Adams Lee</u>), for Defendant-Intervenor.

**OPINION**

**WALLACH, Judge.**

# I

# INTRODUCTION

This case is before the court upon Plaintiffs'[1] Rule 56.2 Motion For Judgment Upon The Agency Record, and Defendant-Intervenor Yieh United Steel Corp.'s Motion For Judgment Upon The Agency Record, both of which challenge the decision of the U.S. Department of Commerce, International Trade Administration (the "Department," "Commerce" or "ITA") in Notice of Final Determination of Sales at Less Than Fair Value:  Stainless Steel Plate in Coils From Taiwan, 64 Fed. Reg. 15,493 (March 31, 1999) ("Final Determination").  Also before this court is a cross-motion for a remand made by Defendant United States in response to Plaintiffs' Motion.

Plaintiffs challenge the Department's decision to assign multiple cash deposit dumping rates to merchandise produced by Defendant-Intervenor Yieh United Steel Corp. ("YUSCO"), depending on whether the subject merchandise is exported to the United States through the middleman Ta Chen Stainless Pipe Co., Ltd. ("Ta Chen") or, on the other hand, through any other channel of distribution.  The United States asks the court to remand this aspect of the Final Determination to Commerce, arguing that the Department should have cited and addressed 19 C.F.R. § 351.107(b), which Defendant asserts is the governing regulation.  YUSCO argues that imposition of a single rate is contrary to congressional intent, and would impose an excessive cash deposit rate on merchandise that is not "tainted" by the middleman dumping found by the Department.  For the reasons stated below, the court remands the Department's determination.

YUSCO challenges four aspects of the Final Determination:  (1) the Department's

---

[1]      Plaintiffs consist of Allegheny Ludlum Corporation, Armco Inc., Butler Armco Independent Union, J&L Specialty Steel, Inc., North American Stainless, the United Steel Workers of America, AFL-CIO/CLC, and Zanesville Armco Independent Organization (collectively, "Plaintiffs").

determination that the sales characterized by YUSCO as indirect export sales were in fact home market sales; (2) the Department's decision to apply facts available, on the basis of YUSCO's failure to report a significant percentage of its home market sales; (3) the Department's decision to apply total adverse facts available; and (4) the Department's determination to adjust YUSCO's reported cost of production ("COP") and constructed value ("CV") data based on YUSCO's submission of accounting records that reflected higher COP and CV than YUSCO reported. For the reasons stated below, the court denies YUSCO's motion in all respects.

## II

## BACKGROUND

On March 31, 1998, the domestic industry filed an antidumping petition alleging that imports from Taiwan of stainless steel plate in coils ("SSPC") were being injuriously dumped in the United States. The Department initiated an antidumping duty investigation on April 20, 1998. See Initiation of Antidumping Duty Investigations: Stainless Steel Plate in Coils From Belgium, Canada, Italy, Republic of South Africa, South Korea, and Taiwan, 63 Fed. Reg. 20,580 (Apr. 27, 1998).

Commerce's investigation with respect to Taiwan focused entirely upon the SSPC of a single Taiwanese producer, YUSCO. In the underlying investigation, YUSCO described itself to Commerce as the largest integrated stainless steel mill in Southeast Asia. During the period covered by the Department's investigation, January 1 - December 31, 1997, YUSCO made all of its United States sales of subject SSPC through Ta Chen, which resold the subject merchandise through its U.S. affiliate Ta Chen International (CA) Corp. ("TCI").

During the early stages of Commerce's investigation, both YUSCO and Ta Chen urged the Department to calculate dumping margins on YUSCO's subject merchandise imported into

the United states on the basis of YUSCO's prices to Ta Chen. In support of their position, both YUSCO and Ta Chen alleged that all of YUSCO's sales of the subject merchandise into the United States took place through Ta Chen and that YUSCO knew at the time of its sales to Ta Chen that all of the subject merchandise produced by YUSCO and routed through Ta Chen was destined for the United States. See Ta Chen Reply to Petitioners (July 20, 1998); YUSCO Questionnaire Response at A-9 (June 24, 1998); Ta Chen Request for Exemption at 1 (June 4, 1998); Ta Chen Reply to Petitioners (July 20, 1998); YUSCO Questionnaire Response (July 21, 1998) (YUSCO's U.S. sales listing identifying Ta Chen as its sole customer for SSPC during the Period of Investigation.).

On August 11, 1998, the domestic industry requested that Commerce initiate a middleman dumping investigation of Ta Chen, and urged the Department to calculate margins of dumping for YUSCO's product sold in the United States by considering both YUSCO's sales prices to Ta Chen and Ta Chen's resale prices to its U.S. purchasers. More specifically, the domestic industry alleged that Ta Chen was reselling YUSCO's SSPC at less than Ta Chen's total cost to acquire the subject merchandise from YUSCO.[2] Shortly thereafter, the Department commenced a middleman dumping investigation of Ta Chen's resales of YUSCO's SSPC to the United States. See Memorandum from Edward Yang to Joseph A. Spetrini, "Stainless Steel Plate in Coils from Taiwan: Whether to Initiate a Middleman Dumping Investigation" (Aug. 28, 1998).

On November 4, 1998, Commerce published its preliminary affirmative antidumping duty determination, assigning YUSCO a preliminary dumping margin of 67.68 percent ad valorem. See Notice of Preliminary Determination of Sales at Less Than Fair Value: Stainless

---

[2]        While the court might speculate as to Ta Chen's motivation in engaging in dumping, or any arrangement that might exist between YUSCO and Ta Chen with regard to U.S. sales, the record does not address this matter.

Steel Plate in Coils From Taiwan, 63 Fed. Reg. 59,524, 59,527 (Nov. 4, 1998) ("Preliminary

Determination").  Commerce also set the "All Others" rate at 67.68 percent ad valorem.  Id.

Commerce concluded preliminarily that there had been no middleman dumping by Ta

Chen, but noted that the timing of Ta Chen's submission of certain data prevented Commerce

from issuing a supplemental middleman dumping questionnaire to obtain additional information

and data for the Preliminary Determination.  63 Fed. Reg. at 59,526.  Commerce indicated that it

intended to revisit this issue, after further analysis and verification, in its final determination.  Id.

On December 3, 1998, Commerce amended its Preliminary Determination.  Notice of

Amended Preliminary Determination of Sales at Less Than Fair Value:  Stainless Steel Plate in

Coils From Taiwan, 63 Fed. Reg. 66,785 (Dec. 3, 1998) ("Amended Preliminary

Determination").  In light of an augmented record, Commerce determined that middleman

dumping by Ta Chen had occurred.  Amended Preliminary Determination, 63 Fed. Reg. at

66,787.  Commerce assigned a preliminary dumping margin of 3.08 percent ad valorem to the

imports into the United States of YUSCO's subject merchandise.  This rate reflected the sum of

what Commerce computed was YUSCO's dumping margin on its sales to the United States

through Ta Chen (0.08 percent ad valorem) and Ta Chen's middleman dumping margin on its

resales of YUSCO's SSPC to U.S. customers (3.00 percent ad valorem). Id.  Commerce also set

the 3.08 percent ad valorem margin as the "All Others" rate.  Id.

On December 14-17, 1998, Commerce sought to verify the data submitted by YUSCO.

YUSCO's data submitted in response to Commerce's request for information regarding its home

market sales and export sales reflected a breakdown of its sales into three categories:  home

market sales, direct export sales (called "Scenario 1" sales)  and indirect export sales ("Scenario

2" sales).   In classifying the sales for reporting to Commerce, YUSCO relied solely on internal

classifications it assigned to transactions.  YUSCO's internal classifications were based on

customers' statements that the product would be exported, and did not involve an inquiry as to whether the customer would further manufacture the product prior to export. In its records, YUSCO classified sales with order numbers starting with "D" or "S" as home market sales, and order numbers starting with "U" as destined for export. "Scenario 1", or "direct export", sales consisted of product shipped directly by YUSCO to the port in Taiwan, for export. Those sales are not at issue here. "Scenario 2", or "indirect export", sales were shipped by YUSCO to a customer in Taiwan for further processing prior to export to third countries. Scenario 2 sales consisted of two general categories. "UZ" sales were made to certain of YUSCO's customers, who are unaffiliated pipe manufacturers located in Taiwan. YUSCO provided less information regarding the other category of Scenario 2 sales, which are referenced as "U*" sales. YUSCO did provide information regarding one "U*" sale customer, which YUSCO stated further manufactured the SSPC into non-subject stainless steel sheet.

At verification, the Department determined that YUSCO had not reported "a large portion" of YUSCO's home market sales of subject merchandise and that YUSCO ". . . withheld information that had been requested by the Department[.]" Final Determination, 64 Fed. Reg. at 15,495. Specifically, Commerce concluded that YUSCO improperly reported the Scenario 2 sales as for export, rather than as home market sales. In so doing, Commerce found, YUSCO ignored explicit definitions and instructions in the Department's antidumping questionnaire, which explained how to classify and report sales and customer codes for home market sales. Commerce concluded that its questionnaire clearly contemplated and required that sales for consumption in the home market be reported as home market sales. Id. In Commerce's words, "YUSCO's withholding of crucial information which the Department needed to calculate an accurate normal value significantly impeded the Department's investigation." Id. Commerce found YUSCO's home market sales database fatally flawed and unreliable, and in its final

determination resorted to total adverse facts available with respect to YUSCO.  Final Determination, 64 Fed. Reg. at 15,495-497.

On March 31, 1999, Commerce published its final affirmative antidumping duty determination.  In light of its finding of YUSCO's lack of full cooperation and the incompleteness and unreliability of YUSCO's database, Commerce applied total adverse facts available to assign YUSCO the highest margin in the domestic industry's petition, 8.02 percent ad valorem.  See Final Determination, 64 Fed. Reg. at 15,493.  Commerce also found that all of YUSCO's subject merchandise sold to the United States during the period of investigation ("POI") had been sent through Ta Chen as YUSCO's middleman.  Final Determination, 64 Fed. Reg. at 15,497-98 (Comment 2 and Department's Position rejecting YUSCO's belated argument that YUSCO made one reported U.S. sale through a company in Taiwan other than Ta Chen; Commerce found that this one sale was actually a home market sale by YUSCO.).  Commerce concluded that Ta Chen had engaged in middleman dumping during the POI by reselling YUSCO's SSPC in the United States at a loss of 2.18 percent ad valorem.  Final Determination, 64 Fed. Reg. at 15,494.

Based upon these findings, Commerce established two cash deposit rates of estimated antidumping duties for YUSCO's SSPC imported into the United States.  For YUSCO's subject merchandise exported to the United States through Ta Chen during the POI, the Department applied a cash deposit antidumping rate of 10.20 percent ad valorem, reflecting the sum of YUSCO's dumping on its sales to Ta Chen plus Ta Chen's middleman dumping on Ta Chen's resales of YUSCO's subject merchandise in the United States.  Final Determination, 64 Fed. Reg. at 15,494.  The Department posted a second cash deposit antidumping rate of 8.02 percent ad valorem for YUSCO's SSPC entering the United States through any channel of distribution other than Ta Chen.  Commerce also calculated an "All Others" rate of 7.39 percent ad valorem.  Final

<u>Determination</u>, 64 Fed. Reg. at 15,507.

# III

# ANALYSIS

## A

### <u>Jurisdiction and Standard of Review</u>

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

In reviewing the <u>Final Determination</u>, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion. <u>Primary Steel, Inc. v. United States</u>, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), <u>aff'd</u>, 810 F.2d 1137 (Fed. Cir. 1987). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." <u>Ceramica Regiomontana, S.A.</u>, 10 CIT at 404-5, 636 F. Supp. at 966.

## B

### <u>Plaintiffs' Motion</u>

Plaintiffs contest Commerce's decision to assign separate antidumping cash deposit rates to YUSCO and Ta Chen, and to impose those rates independent of each other. Rather, they argue, the Department should have assigned a single, weighted-average cash deposit antidumping

rate to all of YUSCO's subject merchandise, regardless of the identity of the exporter.

Upon a final determination of sales at less than fair value, 19 U.S.C. § 1673d(c)(1)(B) directs Commerce to "determine the estimated weighted average dumping margin for each exporter and producer individually investigated," as well as an estimated all-others rate, and to "order the posting of a cash deposit, bond, or other security, <u>as the administering authority deems appropriate</u>, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable[.]" <u>Id.</u> (emphasis added). The statute does not provide further guidance for the Department to follow in exercising the discretion granted to it in § 1673d(c)(1)(B) for the calculation of cash deposit rates. It says nothing whatsoever about middleman dumping rates. While the legislative history accompanying 19 U.S.C. § 1677a (1994) does describe Commerce's authority to investigate middleman dumping, <u>see</u> H.R. Rep. No. 96-317, at 75 (1979) and S. Rep. No. 96-249, at 94 (1979), the court finds no legislative history which speaks to the means by which such dumping should be reflected in a cash deposit rate or rates.

Commerce has, however, promulgated implementing regulations, including 19 C.F.R. § 351.107, which provides in pertinent part:

> (b)     Cash deposit rates for nonproducing exporters-
>
> > (1)     Use of combination rates–
> > > (i)     In general.  In the case of subject merchandise that is exported to the United States by a company that is not the producer of the merchandise, the Secretary <u>may</u> establish a "combination" cash deposit rate for each combination of the exporter and its supplying producer(s).
> > >
> > > (ii)    Example.  A nonproducing exporter (Exporter A) exports to the United States subject merchandise produced by Producers X, Y, and Z.  In such a situation, the Secretary <u>may</u> establish cash deposit

> rates for Exporter A/Producer X, Exporter A/Producer Y, and
> Exporter A/Producer Z.

Id. (emphasis added).  In the preamble to these regulations, Commerce identified circumstances

in which the use of combination rates would be appropriate:

> The Department agrees with the comments suggesting that it is appropriate in
> some instances to establish rates for exporter/producer combinations. Therefore,
> in paragraph (b)(1)(i), we have provided for the establishment of such
> "combination rates."
> * * *
> Establishing a deposit rate for an exporter and, without regard to the identity of
> the supplier, applying that rate to all future exports by that exporter could lead to
> the application of that rate even if other suppliers sold to the exporter with
> knowledge of exportation to the United States. This would enable a producer with
> a relatively high deposit rate to avoid the application of its own rate by selling to
> the United States through an exporter with a low rate. Therefore, in order to
> ensure the proper application of deposit rates, the Department believes that it
> should establish, where appropriate, individual rates for nonproducing exporters
> in combination with the particular supplier or suppliers from whom the exporter
> purchased the subject merchandise.

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,303 (1997) (emphasis added).

Commerce also stated that in certain circumstances, the use of a combination rate would be

inappropriate.

> The Department also believes it is not appropriate to establish combination rates
> in an AD investigation or review of a producer; i.e., where a producer sells to an
> exporter with knowledge of exportation to the United States. In these situations,
> the establishment of separate rates for a producer in combination with each of the
> exporters through which it sells to the United States could lead to manipulation by
> the producer. Furthermore, the Department recognizes that in many industries it is
> not uncommon for a producer to sell some amount of merchandise purchased
> from other producers. In such situations, the Department generally intends to
> establish a single rate for such a respondent based on its status as a producer,
> although unusual circumstances may warrant the application of a combination
> rate.

Id. (emphasis added).

In the Final Determination, although Commerce cited the need to calculate a cash deposit rate that reflects middleman dumping, as well as producer dumping, Commerce did not reference or address the governing regulation, § 351.107. Rather, Commerce cited § 351.106, which does not speak to the issue of middleman dumping. Commerce also did not detail the rationale undergirding its decision to set a combination rate for YUSCO selling through Ta Chen, and a separate rate for YUSCO selling through all channels of distribution.

In the absence of a statutory provision or demonstrated Congressional intent that clearly mandates a single, weighted-average cash deposit rate, the court finds no basis for Allegheny's argument that Commerce erred as a matter of law in assigning multiple cash deposit rates. Nor does a review of the governing regulations demonstrate a departure by Commerce from those regulations. Here, where Congress's intent is unclear, the court must accord Chevron deference to Commerce's construction of the governing statute and its own regulation. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). In the Final Determination, however, Commerce did not sufficiently articulate the rationale underlying its construction of the statute and regulations. This failure precludes effective review by this court, and necessitates remand. Nor can the court determine, in the absence of an elaboration by Commerce of the bases for its decision, whether Commerce's decision is unsupported by substantial evidence or otherwise strays beyond the bounds of its discretion. Allegheny's motion is denied.[3] The court grants the Government's cross-motion for a remand for reconsideration, in accordance with 19 C.F.R. § 351.107(b), by Commerce of its decision to impose channel-specific cash deposit rates for sales by YUSCO.

## C

### YUSCO's Motion

Yusco contests several aspects of the Final Determination. Primarily, YUSCO challenges Commerce's decision to resort to adverse facts available under 19 U.S.C. § 1677e(b) (1994), as well as the subsidiary decision to resort to facts available under 19 U.S.C. § 1677e(a). Central to

---

[3] Allegheny has, in any event, conceded that it "agrees with the United States that a remand is appropriate to enable the Commerce Department, pursuant to the standards in 19 C.F.R. § 351.107(b), to reconsider its determination applying separate cash deposit rates[.]" Reply Brief of Plaintiffs at 1.

its challenge on the facts available issue is YUSCO's contention that the Department improperly

determined that sales reported by YUSCO as indirect export sales were in fact home market

sales, and that YUSCO's failure to report these home market sales warranted the application of

adverse facts available.

YUSCO also challenges another aspect of the Final Determination which, because of the

Department's resort to adverse facts available, was not material to the Department's calculation

of the cash deposit rate ultimately assigned to YUSCO.  Specifically, YUSCO argues that the

Department improperly adjusted its reported cost of production ("COP"), due to discrepancies

between those reported costs and the costs reflected in YUSCO's accounting records.

These claims are examined in turn below.

**1**

**Commerce Properly Invoked 19 U.S.C. § 1677e to Apply Adverse Facts Available**

In the Final Determination, Commerce concluded that the use of facts available was

proper, based on Commerce's conclusion that YUSCO had failed to report all of its home market

sales made during the POI.  Final Determination, 64 Fed. Reg. at 15,493.  Specifically,

Commerce found that, as to the "UZ" sales, "YUSCO knew or had reason to know that the sales

of SSPC to these pipe customers would be used in Taiwan to manufacture non-subject

merchandise (*i.e.*, consumed in Taiwan)."  Final Determination, 64 Fed. Reg. at 15,496

(citations omitted).   As to the U* sales, Commerce stated that "YUSCO did not provide us with

sufficient product or customer information to allow us to determine if the merchandise sold was

exported or further manufactured into non-subject merchandise in Taiwan."  Id. (citations

omitted).  However, "from what information was provided, YUSCO knew that at least some 'U'

sales of SSPC were consumed in the home market by Taiwan manufacturers of downstream products." Id.

Commerce further determined that the use of adverse facts available was appropriate, because it concluded that YUSCO had failed to "act to the best of its ability in the reporting of its home market sales." Final Determination, 64 Fed. Reg. at 15,493. Specifically, Commerce determined that YUSCO did not act to the best of its ability because it relied solely on its internal classification system, which was inadequate as the basis on which to rest YUSCO's designation of sales for export, as opposed to home market. Final Determination, 64 Fed. Reg. at 15,496.

YUSCO raises several arguments that the reclassification of Scenario 2 sales as home market sales, and the application of facts available and adverse facts available, were not supported by substantial evidence and were contrary to law.

**a**

**Commerce Properly Classified the Scenario Two Sales as Home Market Sales**

YUSCO contends that it properly classified the Scenario 2 sales as third country export sales, and that Commerce's determination rested on several factually unsupported conclusions.

First, YUSCO argues that Commerce improperly determined that a sale to one of YUSCO's customers was a "U" sale, and that this determination then led Commerce to improperly determine that other "U" sales were in fact home market sales.

Second, YUSCO argues that its internal classification system provided adequate and reliable evidence that it knew at the time of sale that the "U" and "UZ" sales were export sales.

Third, YUSCO contends that it did not rely only on its internal classification system as the basis for its designation of the "U" and "UZ" sales as export sales. A review of each of these

contentions follows.

The statutory scheme does not provide explicit criteria for determining whether a sale is for export or is a home market sale. LG Semicon Co., Ltd. v. United States, ___ CIT ___, 1999 WL 1458844 at *3 (Dec. 30, 1999).  Export sales are governed by 19 U.S.C. § 1677a(a), which defines the term "export price" as:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)[.]

Id.  Normal value, an adjusted price derived from home market sales, is defined under the following relevant subsection of 19 U.S.C. § 1677b(a)(1)(B):

> (i)      the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price[.]

19 U.S.C. § 1677b(a)(1)(B)(i).

In implementing the provisions of 19 U.S.C. § 1677b(a), sales should be included within the home market database if the producer "knew or should have known that the merchandise was . . . for home consumption based upon the particular facts and circumstances of the case." INA Walzlager Schaeffler KG v. United States, 21 CIT 110, 123-24, 957 F. Supp. 251, 264 (1997), aff'd 108 F. 3d 301 (Fed. Cir. 1997) (footnotes omitted).  On the other hand, in implementing the provisions of 19 U.S.C. § 1677a(a), Commerce looks to whether the producer knew or should have known, at the time of a sale, whether or not the subject merchandise will be exported. See LG Semicon Co., 1999 WL 1458844 at *4 (listing examples of Commerce's application of the

knowledge test); Yue Pak, Ltd. v. United States ITA, 20 CIT 495 (1996), aff'd, 111 F.3d 142

(Fed. Cir. 1997).  This test reflects the guidance of the Statement of Administrative Action which

accompanied the Trade Agreements Act of 1979:  "if the producer knew or had reason to know

that the goods were for sale to an unrelated U.S. buyer . . . the producer's sales price will be used

as 'purchase price' to be compared with that producer's foreign market value."  S.R. Doc. No.

96-249, at 411 (1979).

In determining whether the producer knew or should have known that the subject

merchandise will be exported, Commerce looks in part to the place where the product is

"consumed".  Merchandise cannot be "sold . . . for consumption in the exporting country", 19

U.S.C. § 1677b(a)(1)(B)(i), if it has already been consumed in the home market.  Merchandise

sold in the home market, even if ultimately destined for export, is "consumed" in the home

market if it is used there to produce non-subject merchandise prior to exportation.  See Final

Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products,

Certain Corrosion Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel

Plate From Korea, 58 Fed. Reg. 37,176, 37,182 (July 9, 1993); Final Determination of Sales at

Less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and

Above From the Republic of Korea, 58 Fed. Reg. 15,467, 15,473 (March 23, 1993).  Compare

LG Semicon, 1999 WL 1458844 at *6 (finding that goods were not "consumed" in Mexico

where the producer knew or should have known that the goods it sold to the business there "most

likely could not be processed by that entity or absorbed by the Mexican or Latin American

markets, and instead were destined for export to the United States.").

Although YUSCO acknowledges this governing legal standard, it claims that Commerce

"erroneously relied only on imputed knowledge."  Plaintiff Yieh United Steel Corp.'s Motion for

Judgment Upon the Agency Record ("YUSCO Moving Brief") at 11.  Rather, argues YUSCO,

Commerce should have looked first to "YUSCO's actual knowledge of these sales' final

destination in third countries."  Id. at 12.  This argument fails.

YUSCO bases its actual knowledge argument on a flawed reading of this court's opinion

in INA Walzlager Schaeffler KG, 957 F. Supp. 251.[4]  INA follows the line of authority holding

---

[4]     YUSCO also cites two Commerce determinations which, it claims, reflect an established practice for Commerce to determine the market of the respondent's sales based on the respondent's actual knowledge at the time of sale.  YUSCO Moving Brief at 12 (citing Final Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate From Korea, 58 Fed. Reg. 37,176 (July 9, 1993), and Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon From Chile, 63 Fed. Reg. 31,411 (June 9, 1998)).  Neither of these of these supports YUSCO's position.

In Certain Steel Plate From Korea, Commerce

> included in the home market sales databases and the calculation of FMV those local sales which are further manufactured into merchandise outside the scope of these investigations, in accordance with our practice in DRAMs from Korea. Where a product within the scope of an investigation has been transformed into a product outside that scope before exportation, we consider that product to have been "consumed" within the country, and thus properly includable in home market sales.

Id., 58 Fed. Reg. at 37,182.  As to other local customers which further manufactured the merchandise into both subject and non-subject merchandise, Commerce "excluded [that merchandise] from the home market databases since there is no way to determine the nature of the finished product that was exported from Korea, nor is there any evidence that [the respondent] knew the nature of that product."  Id.

Similarly, in Fresh Atlantic Salmon, Commerce disregarded the producer's assertion of a lack of actual knowledge, focusing on record evidence of knowledge by the consignee, which was imputed to the producer.  See Fresh Atlantic Salmon, 63 Fed. Reg. 31,411.

that

> the appropriate burden of proof for determining whether to exclude sales from the home market database in calculating FMV is whether [the producer] knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales.

Id. at 263-64. The INA court quoted language requiring Commerce "to diligently inquire into . . . allegations" where "the petitioner has provided Commerce with evidence which a reasonable mind would accept as calling into question whether respondents were able to distinguish home market sales destined for consumption in the home market from home market sales destined for consumption in the U.S. market[.]" Id. at 264-65 (punctuation and citation omitted). The court concluded, however, that facts similar to those presented here required a finding of imputed knowledge. The court rejected the producer's argument that "unless [the producer] knew the specific destination of the merchandise and actually admitted to such knowledge, Commerce cannot find [it] should have known the reseller would export the merchandise." Id. at 265. "[U]nder those circumstances, it would be extremely difficult for Commerce to ever conclude that a respondent knew sales were for export[.]" Id. "The only way to determine actual knowledge is through an admission of the respondent." Id. Presumptive reliance on such statements would require deference to self-serving statements even in the face of contrary evidence that the producer should have known the true place of consumption of the subject goods. It would eviscerate the acknowledged standard.

YUSCO also argues that it did not know "at the time of sale", and should not have known, that its merchandise would be further processed into non-subject merchandise prior to exportation. Essentially, YUSCO claims that it was certain that the merchandise would be

exported, but did not have absolute knowledge that the subject merchandise would or would not

be further processed, and that without certain knowledge of further processing, the goods must be

considered to have been for export.[5]  In point of fact, Commerce relied in no small part on

admissions by YUSCO that it had actual knowledge that representative "U" sales would be

further manufactured prior to export, and that "UZ" sales to Ta Chen were further manufactured

into stainless steel pipe.  These admissions are buttressed by a review of the record evidence,

which consistently supports Commerce's conclusion.

**(1)**

**Commerce Properly Concluded That "U" Sales**
**Were For Home Market Consumption**

YUSCO raises several arguments in support of its assertion that Commerce erred in

concluding that the "U" sales, as exemplified by certain sales[6] to one of its customers, were not

export sales, as reported by YUSCO, but should rather have been reported as home market sales.

The court examines each of these arguments in turn.

YUSCO provided transaction-specific information regarding the locus of consumption

for only one of the "U" sales, one of a number of sales made by one of YUSCO's customers.

YUSCO argues that Commerce improperly used this information to discredit the reliability of

---

[5]     YUSCO has also argued that its "UZ" sales into bonded warehouses should be classified as export sales, because goods sold into such warehouses are generally exported. YUSCO admitted at oral argument that such warehouses also may have a manufacturing facility, which permits such goods to be further manufactured, but again asserted that it did not know which of the goods it sold into such bonded warehouses would be further processed.

[6]     YUSCO's initial questionnaire responses identify [     ] such sales; YUSCO later provided certain underlying documentation for one of these sales.  See Sales Verification Report, Exhibit 8a at 28.  YUSCO has identified nothing in the record which would distinguish these sales from each other.

YUSCO's internal coding system as the basis for the classification of "U" and "UZ" sales as for home market or export consumption.  YUSCO Moving Brief at 7, 25.

In its Moving Brief, YUSCO argued that the underlying documentation that it provided in connection with the selected sale identifies that sale as a "D" sale, rather than a "U" sale.[7]  Id. at 9.  On this basis, YUSCO has argued, the selected sale is not representative of the selected "U" sales to the customer at issue, and is instead an isolated and aberrant transaction.[8]   However, in YUSCO's October 19 response (the "October 19 Response") to a supplemental question from Commerce, YUSCO claimed that it "knew that the sale in question was for export to the United States."  Id. at 2.  YUSCO's response characterized that transaction as being for export, thus characterizing it for Commerce's purposes in the same way it had characterized its "U" and "UZ" sales.  Further review of the October 19 Response, however, directly contradicts YUSCO's claim to Commerce that the sale at issue was for export.  It provides the following relevant information:

> YUSCO knew through sales negotiation with [the customer in question] that the customer would export the YUSCO's stainless steel plate in question to the United States. . . .  The attached O.A. [order acceptance] indicates that, when YUSCO received the order from [the customer in question], YUSCO already knew that the sale in question was for export to the United States.  According to YUSCO, its employee in the domestic sales department specifically discussed the final destination of the plate in question at the time of the sale because [this was

---

[7]     In its Reply Brief, YUSCO admits that this assertion was erroneous, and argues instead that the sale at issue was coded "S", for a domestic sale from existing inventory. Plaintiff Yieh United Steel Corp.'s Reply to Defendant and Defendant Intervenor's Response to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("YUSCO Reply Brief") at 3, n.14.

[8]     YUSCO asserts that the classification of the sale at issue, which sale Commerce found had been improperly classified by YUSCO as being for export, formed the "primary reason that the Department could identify to attempt to justify its decision to apply total facts available." YUSCO Moving Brief at 7.

the only sale of such plate to the customer in question].

The O.A. also indicates that [the customer at issue will further manufacture] YUSCO's stainless steel plate. Because [the customer at issue generally further-manufactured YUSCO's subject merchandise, YUSCO understood that it would do so in this case].

October 19 Response at 2 (citation omitted). This submission was subscribed by a certification by a representative of YUSCO that the information contained in the submission was complete and accurate.[9]

YUSCO provided the same information in a letter to Commerce, dated September 22, 1998:

YUSCO, in its September 4, 1998 supplemental response, correctly reported a sale of stainless steel plate to [the customer at issue] as a U.S. sale because YUSCO knew at the time of sale that [the customer at issue] would export the stainless steel plate to the United States. YUSCO understands that [the customer at issue] exported YUSCO's stainless steel plate to the United States [after further-manufacturing it.]

Letter from White & Case to Assistant Secretary of Commerce at 1-2 (September 22, 1998). Although the statements in the October 19 Response and the September 22 letter were prompted by questions regarding a single sale, YUSCO framed its response of knowledge regarding this customer's further processing as one of categorical knowledge.

Elsewhere in its brief, YUSCO argues that it did not know that the additional manufacturing done by the customer at issue was sufficient to constitute "consumption" within the home market. This assertion is belied by YUSCO's October 19 Response, in which it certified that "[b]ecause [the customer at issue generally further manufactured YUSCO's subject

---

[9] YUSCO again contradicts itself in its moving brief, in which it elsewhere argues that "the Department should treat YUSCO's sale to [its customer] as a U.S. sale." YUSCO Moving Brief at 24 (initial capitals omitted).

merchandise], YUSCO understood that [it would do so in this instance.]" Id. at 2. As the subject

merchandise is "4.75 mm or more in thickness", Final Determination, 64 Fed. Reg. at 15,493, it

is plain that YUSCO understood at the time of sale that this customer's conduct constituted

further manufacturing into non-subject merchandise, and thus consumption in the home market.

YUSCO's October 19 and September 22 submissions provide substantial evidence

supporting Commerce's determination that the sales to the customer at issue which YUSCO had

classified as "U" sales were in fact home market sales.[10] The sole basis for YUSCO's argument

to the contrary, which assigns paramount significance to an order number beginning with a "D"

or an "S", is belied by YUSCO's own submissions. YUSCO emphatically represented to

Commerce that it knew that this customer would further manufacture the subject merchandise

into non-subject merchandise prior to export. These statements provide substantial,

---

[10]    In its reply brief, YUSCO for the first time argues that the Department incorrectly
identified Customer A as the "U" sale discussed in the Final Determination. USCIT Rule 81(1)
provides that a "reply brief shall be confined to rebutting matters contained in the brief of the
respondent[s]." "Nevertheless, the Court may exercise its discretion to prevent knowingly
affirming a determination with errors." Coalition For the Preservation of Am. Brake Drum and
Rotor Aftermarket Mfrs. v. United States, 44 F. Supp. 2d 229, 239 (C.I.T. 1999) (quotation
omitted). Where a party raises a clear error in its belated argument, the court may consider it. Id.
       Here, YUSCO asserts that "the only transaction-specific information on the record
regarding 'U' sales was sales documentation to [Customer B], not a sale to [Customer A]. The
Department thus confused [the] customer names . . . in discussing the U sales in question."
YUSCO Reply Brief at 7 (footnote omitted). In support of this argument, YUSCO cites to a
certain attachment to an exhibit to the Sales Verification Report, which contains documentation
relating to Customer B. This document is not, however, cited in the Final Determination, which
instead relies on YUSCO's September 4, 1998 supplemental questionnaire response. That
Supplemental Questionnaire Response, set forth above, contains no mention of Customer B, and
speaks only of Customer A.
       YUSCO's arguments regarding evidence that sales to Customer A were for export to a
third country are irrelevant. Eventual export does not convert a home market sale into an export
sale, when that sale has been further manufactured into non-subject merchandise prior to export,
as YUSCO has repeatedly admitted. These belated arguments show no clear error.

uncontroverted evidence supporting Commerce's determination that the sales to this customer were home market sales. There is no basis for a reversal of Commerce's decision in this regard.

YUSCO asserts that "[t]he Department verified that YUSCO uses the order number coding in the normal course of business to document its knowledge at the time of sales that all 'U' sales would be exported to third countries." YUSCO Moving Brief at 8, citing the Sales Verification Report, at 7. That document does not, however, support YUSCO's assertion. While it restates YUSCO's claim on this point, it then lists shortcomings in the documentation YUSCO produced to support that claim.[11]

YUSCO also argues that Commerce "fully verified the accuracy of the 'UZ' sales and 'U' sales information at verification." YUSCO Moving Brief at 19. YUSCO states that Commerce "verified YUSCO's subject and non subject merchandise sales to all countries." Id. (citing page 5 of the Sales Verification Report). Review of that report shows that "YUSCO demonstrated that the non-subject sales were indeed non-subject and that the subject return sales were not reported in the response." Id. The Verification Report does not support YUSCO's broader inference, that Commerce verified that the subject sales were properly classified by YUSCO as home market or export.

YUSCO states that Commerce found "no discrepancies" in its comparison of YUSCO's lists of individual sales with their sales invoices. YUSCO Moving Brief at 19 (citing Sales Verification Report at 7). Page 7 of that Report contains no such finding. Elsewhere in the

---

[11]    YUSCO appears to operate under the misapprehension that mere recitation of its claims within the Verification Report somehow constitutes verification of those claims. This is not so. The Verification Reports recites many such claims while acknowledging that they could not be verified, or were indeed refuted to the facts gleaned through verification.

Report, Commerce states that "in conducting our ten U.S. market sales traces . . . we confirmed the values contained in certain fields of YUSCO's most recent U.S. market sales database submitted to the Department," such as "customer code, customer name, invoice date, invoice number, shipment date, payment date, quantity, gross unit price, destination, and coil number." Id. at 9-10. There is a similar statement regarding traces of home market sales. Id. at 8-9. Verification that YUSCO correctly copied these objective details into its reports to Commerce lends no support to YUSCO's claim that "U" sales were for consumption outside of Taiwan, which is the only salient issue. YUSCO's claim that "[t]he Department confirmed at verification that the 'U' and 'UZ' sales lists that YUSCO provided to the Department were complete, accurate and reliable" is correct in that YUSCO appears to have correctly reported the existence of subject sales, but is misleading to the extent the Department was unable to verify YUSCO's categorization of those reported sales. See Sales Verification Report at 7.

YUSCO then claims that Commerce incorrectly concluded that YUSCO relied solely on its internal order codes to determine that its "U" sales were export sales. See YUSCO Moving Brief at 10. YUSCO argues that Commerce verified that sales values for the "U" sales were denominated on the order acceptance memos in currencies other than New Taiwan dollars, and argues that this currency denomination provided a reason for YUSCO to know that its "U" sales customers would ultimately export the SSPC at issue. See YUSCO Moving Brief at 10.[12]   In

---

[12]      YUSCO also claims, elsewhere in its moving brief, that "UZ" sales were negotiated in a foreign currency, and that this signifies that those sales were for export. The Verification Report, which YUSCO states confirms its claim, actually notes that "there was no indication of the currency on the order acceptance," the very document which YUSCO claims reflected the currency. Sales Verification Report at 7. YUSCO cites to no other document in the record to support its currency argument. Even if it did, this court has previously rejected an identical argument, noting that "many international transactions are conducted in U.S. dollars."

fact, the verification report directly contradicts YUSCO's assertion: it specifically states that "there was no indication of the currency on the order acceptance."[13]  Sales Verification Report at 7.

YUSCO also argues that each commercial invoice it issued to "U" sales customers contained a shipping number followed by an asterisk, which YUSCO states that it used for all of its indirect export sales, but not for home market sales.  However, in YUSCO's Reply Brief, it states that "YUSCO did not prepare commercial invoices or sales contracts with its immediate customers in Taiwan for 'indirect export' at the time of sale.  These documents were never created by YUSCO in the ordinary course of business."  YUSCO Reply Brief at 4 (footnotes omitted).  While an unaided examination of the lengthy record reveals a group of "Governmental Uniform Invoices" ("GUIs") contained in Sales Verification Report Exhibit 11, those GUIs contain no identification of any shipping numbers, nor do they contain order numbers which would identify the denoted sales as "U" sales.  Essentially, YUSCO again relies on its own faulty internal classification system.

YUSCO's arguments that its "U" sales were not home market sales all rest ultimately on YUSCO's internal documentation, documentation which it has conceded did not reflect whether the product contained in the "U" sales would be consumed in the home market prior to exportation.  These arguments fail in the face of YUSCO's repeated admissions that it knew that

---

Yue Pak, Ltd., 20 CIT at 500.

   [13]    The record does include another transaction-specific document for a lone "U" sale which reflects a price of $_____, although the record does not indicate whether that notation signifies New Taiwan dollars, U.S. dollars, or another currency.  There are 3 such documents for "UZ" sales.

one customer, at least, purchased the product for further manufacturing domestically.  That

knowledge provides substantial evidence supporting Commerce's determination that YUSCO

knew or should have known that the other "U" sales would be further manufactured domestically

and should properly have been included in the list of home market sales provided to Commerce.

### (2)

### Commerce Properly Concluded That "UZ" Sales Were For Home Market Consumption

YUSCO raises several arguments in support of its assertion that Commerce erred in

concluding that the "UZ" sales were not export sales, as reported by YUSCO, but should rather

have been reported as home market sales.  The court examines and rejects each of these

arguments in turn below.

YUSCO claims that Commerce ignored certain facts which, it argues, compel the

conclusion that the "UZ" sales were for export.  First, YUSCO argues that "an overwhelming

part" of "UZ" sales were to a bonded area.  The Verification Report does recite YUSCO's

statement that Customer C, one of three recipients of the "UZ" sales, was a bonded factory.

Sales Verification Report at 7.  YUSCO claims that Commerce verified that no SSPC "would

be" reintroduced into the home market from the [Customer C] factory.  In actuality, the

Verification Report simply reiterates YUSCO's claim that merchandise that enters a bonded

factory can not be introduced into the local economy.[14]  YUSCO abandoned this claim at oral

argument, conceding that merchandise may be reintroduced from a bonded warehouse.

---

[14]     Again, YUSCO seems to conflate Commerce's recitation of YUSCO's responses with the verification of those responses.  It is plain from the face of the Verification Report that there is no corroboration of YUSCO's bonded factory assertions.

Moreover, the Verification Report also documents YUSCO's own statement that "[Customer C] converted all 'UZ' sales of SSPC into pipe before export." Id. YUSCO has not contested this finding that the "UZ" sales were consumed within the home market within the meaning of 19 U.S.C. § 1677b(a)(1)(B)(i).

YUSCO also states that Commerce verified that it collected no value added tax ("VAT") in connection with the "UZ" sales, and that this demonstrates that these sales were not for export. The Verification Report, however, contains no such conclusion, nor do the referenced invoices so indicate. Although those invoices contain prompts for "VAT INCL." and "VAT EXCL.", neither box is checked. At oral argument, YUSCO claimed with no citation to authority that this ambiguity should be construed in its favor. The court declines to do so, and in any event, as the Final Determination notes, at 15,496-97, at the time the merchandise is exported, the Taiwan government reimburses YUSCO's indirect export customers such as Customer C and Customer A for any VAT paid to YUSCO.

YUSCO's arguments regarding the Department's classification of the Scenario 2 sales do not reveal any error in that aspect of the Final Determination.

**b**

**Commerce Properly Resorted to Facts Available**

Based on YUSCO's failure to provide full information regarding its home market sales, Commerce concluded that it was appropriate to apply facts available. 19 U.S.C. § 1677e(a) sets forth four situations, any one of which requires Commerce to resort to "facts otherwise available." That section provides:

(a)     In general

> If–
> (1)      necessary information is not available on the record, or
> (2)      an interested party or any other person–
>   (A)      withholds information that has been requested by the administering authority or the Commission under this subtitle,
>   (B)      fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>   (C)      significantly impedes a proceeding under this subtitle, or
>   (D)      provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
> the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

Id.  Commerce is required to "fairly request" the data it seeks from respondents.  Helmerich & Payne, Inc. v. United States, ___ CIT ___, 24 F. Supp. 2d 304, 308 (1998); Koyo Seiko Co. v. United States, 92 F.3d 1162, 1165 (Fed. Cir. 1996).  At oral argument, YUSCO conceded it does not argue that there was any ambiguity in either the statute or in Commerce's instructions to it.

Having fairly requested that YUSCO provide complete data for all home market sales of subject merchandise, Commerce possesses the "discretion to determine whether a respondent has complied with an information request."  Daido Corp. v. United States, 19 CIT 853, 861, 893 F. Supp. 43, 49-50 (1995) (citing S. Rep. No. 249, 96th Cong., 1st Sess., at 98 (1979); H.R. Rep. No. 317, 96th Cong., 1st Sess. 77 (1979)).  Commerce, exercising this discretion under § 1677e(a), concluded that YUSCO had withheld requested information, by failing to identify a substantial portion of its home market sales.  Final Determination, 64 Fed. Reg. at 15,495.

Commerce also found that this information, belatedly provided in response to Commerce's further inquiry at verification, was not provided in a timely manner.  Id.  The record contains several indications that YUSCO knew or should have known that the purchasers

of its "U" and "UZ" sales further manufactured the product into non-subject merchandise, such

that the product was consumed within the home market.  YUSCO admitted at verification that it

knew "that the coil was slit by the customer and then it was made into pipe.  The pipe was then

exported to third countries."  Sales Verification at 7.  Its October 19 Response is an example of

another such indication.

Finally, Commerce found that the information withheld significantly impeded the

investigation because, in its absence, accurate calculation of normal value was impossible.  Final

Determination, 64 Fed. Reg. at 15,495.

YUSCO raises several arguments contesting the propriety of Commerce's use of facts

available.

YUSCO cites 19 U.S.C. § 1677m(d).  19 U.S.C. § 1677m provides the following relevant

provisions:

> (d)     Deficient submissions.
> If the administering authority or the Commission determines that a response to a
> request for information under this title does not comply with the request, the
> administering authority or the Commission (as the case may be) shall promptly
> inform the person submitting the response of the nature of the deficiency and
> shall, to the extent practicable, provide that person with an opportunity to remedy
> or explain the deficiency in light of the time limits established for the completion
> of investigations or reviews under this title.  If that person submits further
> information in response to such deficiency and either–
> (1)     the administering authority or the Commission (as the case may be) finds
>         that such response is not satisfactory, or
> (2)     such response is not submitted within the applicable time limits,
> then the administering authority or the Commission (as the case may be) may,
> subject to subsection (e), disregard all or part of the original and subsequent
> responses.
> (e)     Use of certain information
> In reaching a determination under section . . . 1675 . . . the administering authority
> and the Commission shall not decline to consider information that is submitted by
> an interested party and is necessary to the determination but does not meet all the

applicable requirements established by the administering authority or the
Commission, if–
(1)     the information is submitted by the deadline established for its submission,
(2)     information can be verified,
(3)     the information is not so incomplete that it cannot serve as a reliable basis
        for reaching the applicable determination,
(4)     the interested party has demonstrated that it acted to the best of its ability
        in providing the information and meeting the requirements established by
        the administering authority or the Commission with respect to the
        information, and
(5)     the information can be used without undue difficulties.

Id. (emphasis added).  YUSCO claims that Commerce should have provided an opportunity for

YUSCO to provide additional information in response to the deficiencies found at verification in

YUSCO's reporting of its home market sales. YUSCO Moving Brief at 16.  YUSCO claims that

it did not become aware until verification that its "U" and "UZ" sales "could be considered home

market sales," and that it thus had a legitimate reason not to report those sales as home market

sales.  Id. at 17.  YUSCO argues that Commerce is obligated to provide YUSCO with an

opportunity to correct a misunderstanding such as this.

          YUSCO analogizes this situation to that in Ta Chen Stainless Steel Pipe Ltd. v. United

States, 1999 WL 1001194 (C.I.T. Oct. 28, 1999).  The court in that case found that Commerce

failed to provide a sufficient opportunity to remedy a submission which the court found was

deficient due to ambiguous requests by Commerce for information.  Id. at *12.  Commerce had

"applied an adverse facts available margin to these sales because Ta Chen did not provide

information on [its affiliate's] U.S. sales."  Id.  "Commerce could . . . foresee that in order to

properly calculate Ta Chen's sales as CEP sales, it would need information on Sun's U.S. sales.

But Commerce did not ask for this information specifically."  Id.  The Ta Chen court cautioned

that

> broad questions initially asked of [respondent do] not discharge [Commerce] from its obligation to put parties on notice as to the deficiencies in their responses. The court will not endorse an investigation where [Commerce] sent out a general questionnaire and a brief deficiency letter, then effectively retreated into its bureaucratic shell, poised to penalize [respondent] for deficiencies not specified in the letter that [Commerce] would only disclose after it was too late, i.e., after the preliminary determination.

Id. at *13 (quotations and punctuation omitted) (citing Bowe-Passat v. United States, 17 CIT 335, 343 (1993)).  The linchpin of the court's finding rested on its conclusion that "Commerce has behaved in the same way as it did in Bowe-Passat by failing to notify the respondent of the deficiency when it had an opportunity to do so[.]" Id.

This case is different from Ta Chen.  Commerce has not "hidden the ball" in its initial requests for information from YUSCO.  Commerce plainly requested data regarding all home market sales, defined the term, and invited respondents to contact it for clarification of any matter as to which it was unclear.  YUSCO has conceded that Commerce fairly requested this data.  In response to this inquiry into home market sales, a defined term that is one of the central issues in any dumping investigation, YUSCO had a statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce.  Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990).  Commerce asked YUSCO to report all of its home market sales, which for several years have been defined as including all subject merchandise consumed (including merchandise further manufactured) within the home market. See, e.g., Stainless Steel Plate From Korea, 58 Fed. Reg. at 37,182; DRAMs From Korea, 58 Fed. Reg. at 15,473.  This situation differs from that in Ta Chen, in which "a new statute was not fully explained and Commerce suspected that" there would be a need for additional information. Ta Chen, 1999 WL 1001194 at *14.  The standards for home market sales are clear.  This

situation also differs from Ta Chen in that YUSCO admittedly had knowledge that at least some of its customers further manufactured its merchandise prior to export, thus providing a reason for YUSCO to inquire further in the course of preparing its response to Commerce. Commerce, on the other hand, had no reason to realize prior to verification that the information thus far provided to it was deficient. YUSCO had certified in two questionnaire responses that it had reported all of its home market sales. See YUSCO July 21, 1998 Response and White & Case November 20, 1998 Letter to Commerce. The deficiencies in YUSCO's responses do not fall within the scenario described in Ta Chen.

Nor do the terms of § 1677m(d) give rise to an obligation for Commerce to permit a remedial response by YUSCO. Its remedial provisions are not triggered unless the respondent has met all of the five enumerated criteria. Failure to fulfill any one of these criteria renders § 1677m(d) inapplicable. As the Final Determination sets forth, YUSCO failed to meet three of these criteria. First, the additional information was not submitted by the established deadline; it was not discovered until verification. See 19 C.F.R. § 351.301(b)(1) (deadline for submitting factual information in antidumping investigation is "seven days before the date on which the verification of any person is scheduled to commence"). Second, YUSCO's Scenario 2 sales listings were not sufficiently complete for incorporation into the rest of the data; they provided data on only ten out of fifty data categories required by Commerce. Such shortcomings would threaten the accuracy of the resulting margin calculations. Third, the belated information could not be used without undue difficulties, in that its incorporation would have required the gathering and verification by Commerce of data for the additional data fields ignored by YUSCO, or Commerce would have had to reduce the precision of its dumping calculations by discarding

those forty categories of data. Although Commerce granted YUSCO's request to extend the investigation, that only extended to 90 days the statutory period during which Commerce was required to complete the investigation, gathering and verification of the additional data. This court cannot say that completion of those tasks within 90 days did not present an undue difficulty.

YUSCO claims, without providing any authority or support within the record, that Commerce requested Scenario 2 sales data during verification, and that YUSCO provided the requested information within time limits and in a format set by Commerce at that time, and that Commerce accepted this data, included it within the record, and "confirmed at verification that the 'U' and 'UZ' sales lists that YUSCO provided . . . were complete, accurate and reliable." YUSCO Moving Brief at 20. Review of the Verification Report and the record does not offer any support for YUSCO's assertions.

The court finds no error in Commerce's application of facts available.

### c

### Commerce Properly Resorted to Adverse Facts Available

19 U.S.C. § 1677e(b) governs the use of adverse facts available in an antidumping investigation, and provides:

(b)     Adverse inferences.

If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information

derived from–
(1)     the petition,
(2)     a final determination in the investigation under this title,
(3)     any previous review under section 1675 of this title or determination under section 1675b of this title, or
(4)     any other information placed on the record.

Id.  "[T]o be supported by substantial evidence, Commerce needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation."  Mannesmannrohren-Werke AG v. United States, ___ CIT ___, 77 F. Supp. 2d 1302, 1313-14 (1999); accord  Ferro Union, Inc. v. United States, ___ CIT ___, 44 F. Supp. 2d 1310, 1330-31 (1999).  Where Commerce concludes that the respondent wilfully tried to withhold requested information, Commerce should "explicitly state such a conclusion, [and] identify why [the] errors [are something] more than inadvertent omissions."  Mannesmannrohen-Werke, 77 F. Supp. 2d at 1315.  "A respondent can fail to respond because it was not able to obtain the requested information, did not properly understand the question asked, or simply overlooked a particular request."  Id. at 1316.  Commerce must rather explain why an omission is a deliberate evasion, rather than an oversight.  Id.  Insufficient attention to statutory duties under the unfair trade laws can also be sufficient to warrant adverse treatment.  Nippon Steel Corp. v. United States, 2000 WL 1599938 at *11 (CIT October 26, 2000).  "It implies an unwillingness to comply or reckless disregard of compliance standards. Commerce must be in a position to compel meaningful attention to and compliance with its requests."  Id.  The deficient response  must be analyzed in light of the respondent's overall conduct, the importance of the information, the particular time pressures of the investigation, and any other information that bears on the issue of whether the deficiency was an excusable

inadvertence or a demonstration of a lack of regard for its responsibilities in the investigation.

Id.

YUSCO contends that the Final Determination does not include a finding that YUSCO's

failure to include Scenario 2 sales constituted a failure to cooperate to the best of its ability.

YUSCO Moving Brief at 22.  In fact, however, Commerce found in the Final Determination that

"by not reporting a large portion of the home market database (so-called scenario two sales),

YUSCO withheld information that had been requested by the Department (*i.e.*, all home market

sales of the foreign like product) and did not act to the best of its ability[.]"  Final Determination,

64 Fed. Reg. at 15,495.  Commerce set forth additional findings on this subject in its March 19,

1999 Facts Available Memorandum:

> By not reporting a large portion of the home market database, YUSCO withheld
> information that had been requested by the Department (i.e., all home market sales
> of the foreign like product) and did not act to the best of its ability in providing
> this information.  Because the Department discovered the existence of these sales
> only at verification, this information was not provided in a timely manner (i.e., in
> response to Section B of the Department's questionnaire). . . .  Further, we learned
> for the first time at verification that in determining that these scenario two sales
> were for export, YUSCO relied solely upon its internal classifications. . . .
> YUSCO merely relied upon customers' statements that a product would be
> exported, without taking into account whether the customer would further process
> the SSPC into non-subject merchandise prior to export. . . . Because YUSCO's
> classification was inadequate, by relying on it YUSCO failed to comply to the best
> of its ability with the Department's instructions.  Moreover, what information it
> did possess regarding its Taiwan customers indicates that its merchandise was
> consumed in the home market.

Id. at 2-3.  These findings, together with those set forth in the Final Determination, are

sufficiently explicit under § 1677e(b).  Commerce's findings show that YUSCO failed to report

approximately _____% of its home market sales, a reporting failure that goes to the heart of a

dumping investigation.  Commerce stated, and YUSCO has not disputed, that it did not learn of

the deficiency until verification, at which time the "time pressures of the investigation" prevented

further supplemental questionnaires. This is not a situation such as Mannesmannrohen-Werke or

Ferro, where the shortcomings in the response were arguably due to the existence of new

governing laws and unclear requests by Commerce for information. Here, Commerce squarely

requested data regarding home market sales, a term which was defined both in the questionnaire

and by longstanding practice. YUSCO twice certified the accuracy and completeness of its

reported home market sales databases. The responsibility for the deficient response here rests

squarely with YUSCO, whose response displayed a disregard for the statute and for its

responsibilities in the investigation.

YUSCO asserts that inclusion of the "U" and "UZ" sales in its home market sales would

have favored YUSCO, by lowering the average per-unit home market price. In support of this

assertion, YUSCO cites the Facts Available Memorandum, which shows tonnage and aggregate

value for the reported home market sales, and the reported home market sales augmented by the

Scenario 2 sales. Expression of those figures as a ratio shows a lower price per ton of the home

market sales if the Scenario 2 sales are included than if YUSCO's original reported numbers are

used. The Scenario 2 numbers are crude, however, and do not reflect the more sophisticated 50-

field analysis that Commerce prepares when provided with a complete response. It is undisputed

that YUSCO did not provide information for the full range of data fields for the Scenario 2 sales

when Commerce requested that information at verification, upon its discovery that those sales

were properly includable in the home market sales database. YUSCO argues that this omission

was immaterial, and that the omitted information had either already been provided or would have

favored YUSCO. Commerce contends that omission of this information prevented Commerce

from matching transactions. At verification, YUSCO provided information for 10 fields for the "UZ" sales, and for 11 fields for the "U" sales. See Response Brief of Plaintiffs at 11-12 for a listing of those fields. YUSCO argued in its Reply Brief that it had already provided some of the remaining fields in its July 21, 1998 response (the "July 21 Response"), regarding home market sales generally. YUSCO Reply Brief at 12, n.66, and 13, n.67. Review of the July 21 Response appears to indicate that many of the answers set forth therein would apply to the Scenario 2 sales without further supplementation. See, e.g., July 21 Response at B-19 (providing generic responses for certain fields); and B-20 to 27 (indicating that there was no responsive data to report). YUSCO also argued that the remaining fields relate to expenses which would reduce normal value, and which Commerce normally denies absent proper proof by the respondent. See RHP Bearings v. United States, 19 CIT 133, 139, 875 F. Supp. 854, 859 (CIT 1995). Examination of the July 21 Response reveals, however, several fields which YUSCO treated on a transaction-specific basis and which do not fall squarely under the heading of "expenses". See, e.g., July 21 Response at B-16, B-17 (date of receipt of payment, terms of delivery, terms of payment). These fields appear to substantiate Commerce's position that the matching needed for a proper margin computation was adversely impacted. On these facts, the court cannot say this determination was not supported by substantial evidence.

YUSCO also argues that Commerce improperly applied the "worst facts available", although YUSCO was "otherwise cooperative." This court has indeed sanctioned a graduated approach to the use of adverse facts available, to "impose[] the most adverse rates upon those refusing to cooperate or otherwise significantly impeding the proceedings and less adverse rates upon those who are substantially cooperative but failed to provide requested information in a

timely manner or in the form requested." Krupp Stahl A.G. v. United States, 17 CIT 450, 453-54, 822 F. Supp. 789, 793 (1993). This gradual approach is in keeping with Commerce's "particularly great" discretion under the statute to select among a variety of secondary sources in order to create the proper deterrent to non-cooperation and to ensure a reasonable margin. See F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). This discretion is not, however, "unbounded." Id.

> [T]he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins. . . . Congress . . . intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.

Id. (citations omitted). The question thus presented by YUSCO's claim is the level of its cooperation on a graduated scale, within the parameters of the already extreme behavior required for a threshold invocation of adverse facts available. YUSCO should not be penalized in the manner of a respondent that has flatly refused to submit information, while on the other hand, the information withheld was not peripheral to the investigation. Similarly, where on the continuum of possible rates does that imposed by Commerce fall? Commerce utilized the highest petition rate, a secondary source whose use is expressly permitted under 19 U.S.C. § 1677e(b)(1). Commerce corroborated this rate by comparing the petition's sources with YUSCO's reported sales databases, and by reviewing the evidence supporting the petition's calculations. This rate is not, in actuality, the "worst" rate available. Commerce could have selected a higher rate based on YUSCO's submitted information or other information in the record. See 19 U.S.C. § 1677e(b)(1). Within these parameters, Commerce's decision to apply the highest petition rate falls well within its statutory discretion.

The court finds no error in Commerce's application of adverse facts available.

**d**

**YUSCO's Reported Cost of Manufacture**

Yusco contends that Commerce erred in adjusting YUSCO's COP and CV, based on Commerce's determination that YUSCO did not identify and quantify all differences between its submitted COP and CV data, on the one hand, and its audited financial statement, on the other hand.  YUSCO Moving Brief at 27.

The Government argues that the cost adjustment issue is not yet ripe for adjudication, and thus is not justiciable, because Commerce utilized total adverse facts available, such that the margin imposed did not rest in any way on the adjusted COP and CV.

> [The] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.  The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967).  The Supreme Court thus requires application of a two-part test to determine whether a case is ripe for judicial action.  First, the court must determine whether the issues are fit for judicial decision--that is, whether there is a present case or controversy between the parties, see Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506 (1972); BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 977 (Fed. Cir. 1993); and second, whether there is sufficient risk of immediate hardship to warrant prompt adjudication -- that is, whether withholding judicial decision would work undue hardship on the parties,

MacMullan, 406 U.S. at 506; Pacific Gas & Elec. Co. v. State Energy Resources Conservation &

Dev. Comm'n, 461 U.S. 190, 200-01 (1983). Both prongs must be satisfied before an Article III

court may apply its adjudicative powers to a case's merits.

This issue is indeed not yet ripe for adjudication. There is no actual controversy between

the parties, because Commerce did not set the cash deposit rate based in whole or in part upon

the adjusted cost of manufacturing. The cash deposit rate imposed rests entirely on total adverse

facts available. YUSCO has not been injured in any way by Commerce's decision to adjust the

cost of manufacturing. Commerce did not rest its facts available determination upon its

conclusion that the cost of manufacturing required adjustment. A decision by this court in

YUSCO's favor on this issue would result in no benefit whatsoever to YUSCO. If YUSCO were

to appeal on the issues of facts available and adverse facts available, and to prevail on both

issues, such that Commerce were somehow wholly precluded from applying either provision, the

case would be remanded to Commerce for calculation of the proper margin. Unless and until

these events have come to pass, there is no controversy for this court to adjudicate.[15]

## IV

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment Upon the Agency Record is

Denied, and the cross-motion by the United States for remand is granted. YUSCO's Motion for

---

[15]     The Government also raises the ripeness argument in response to YUSCO's claim that Commerce improperly determined that YUSCO should have known that at least one of its sales was a home market sale. Because Commerce's decision to resort to facts available rests in part on its analysis of these sales, the court finds the existence of a controversy ripe for adjudication.

Judgment Upon the Agency Record is denied in all respects.


_____
Evan J. Wallach, Judge


Dated:          December 28, 2000
                New York, New York